32 So.2d 236

**STALLINGS v. STATE.**

4 Div. 447.

Supreme Court of Alabama.

July 31, 1947.

Rehearing Denied Oct. 30, 1947.

See also ante, p. 1, 32 So. 233.

D. M. Powell and Powell & Hamilton, all of Greenville, and Richard T. Rives and Hill, Hill, Whiting & Rives, all of Montgomery, for appellant.

A. A. Carmichael, Atty. Gen., and MacDonald Gallion, Asst. Atty. Gen., for the State.

FOSTER, Justice.

This appellant was convicted of murder in the second degree, and his punishment fixed at ten years in the penitentiary. The deceased was Lawrence Rogers, and was killed on the night of April 12, 1944. The defendant lived with his father, Willie Stallings, his mother and sister on the east side of the Honoraville and Black Rock Road extending north and south. Their place of residence was about half a mile north of the intersection of another road from the west, extending into that one, on which latter road deceased lived with his father and two brothers, about a quarter or half of a mile from the intersection of the two roads. James Rogers, a brother of deceased, was present and witnessed the killing of Lawrence Rogers. Deceased was twenty years old, four feet nine inches tall, and weighed eighty pounds. James Rogers was eighteen years old. The defendant was twenty-three years old.

That afternoon when the day's work was over on the farm, defendant started on his bicycle down the road south toward Charlie Lowery's who lived on the Honoraville and Black Rock Road south of the intersection mentioned above. He stopped in front of Acreman's house near the intersection. R. J. Sexton was there. He lived farther north on the same road. Sexton had shot Hubert Rogers, a brother of James Rogers and of Lawrence Rogers, deceased. James and a negro named Lowery had carried Hubert off for treatment and were returning in a pickup truck, and saw defendant and Sexton together. They went home, and he and Lawrence returned, and James testified that they were going to Well's store on that road farther north from the Stallings' home. After defendant went down the road and was returning, he saw James and Lawrence coming toward the road defendant was on. They were walking east from the direction of their home, and defendant was then again at Acreman's on his return trip. Defendant claims that he then heard deceased, Lawrence Rogers, say "old Guy Stallings, I will kill that son of a bitch before bedtime." Defendant then got on his bicycle and went north on that road to his home. James Rogers claims that they did not then see Guy Stallings at that time; that they proceeded along the road north by the Stallings' house. James Rogers testified Mr. Stallings was out in front of the house and flashed the light in their faces and said, "What you boys doing cursing out here?" "I said, ain't nobody cursing, and we walked on and he came with his light and said, 'Wait a minute, let's see if you got any liquor on you.' We didn't stop and kept walking. We walked a few more steps and the gun fired. I stopped when my brother fell in front of me. I turned around and faced them and Mr. Stallings turned to his boy and said, 'Guy, I told you not to do that.' I stayed there and he told Guy to get Mr. Alvin Turner to go after the law. I saw Guy Stallings there. He was four good steps behind us in the same rut I was in. He had a twelve gauge shotgun in his hand. If Mr. Willie had a shotgun I didn't see it. We stood there and I made a step back toward them and Guy stepped back and cocked his gun in my face and told me not to come no further and I stopped." He further tesified that at the time the shot was fired he and his brother Lawrence both had their backs to the man who fired the gun. The evidence shows that the shot entered the right side of the deceased's face and lodged in the back part of the head to the right of the median line of the face.

Defendant testified that as he was proceeding toward his home, he was followed by James and Lawrence and one of them called to him to wait, but he kept on and they continued to follow him up the road

to his father's house cursing and threatening him. Defendant went in the house. The family was eating supper. He refused to eat anything, went out on the back porch and got a drink of water, came back to the dining room and *said something to his father,* who a little after that went out on the back porch and sat there for awhile. The deceased and his brother James came on up the road, made threats against the defendant, called him vile names, entered the yard with the avowed purpose of taking the defendant from the house and killing him. Defendant's father, after going out on the back porch and hearing voices coming from down the road toward his house, went to the front porch and heard them as they approached. He heard them make threats about getting the defendant out and saw them as they entered his yard. They were approaching the steps, still threatening when the father stopped them. They then went back outside the yard. One of them called to Willie Stallings to come out that they wanted to talk to him. He complied with their request, came on out and stopped at the mail box by the road and said they would talk the matter over there. James said no, that they would go on down the road and talk. The father went a short distance with them and then said he would not go any further. When this was said both Lawrence and James Rogers turned on the father and Lawrence cut at him with his knife. When he did this the defendant, who was eight or ten feet to the rear, fired the shotgun, the contents entering the right of Lawrence Rogers' face, resulting in his death. The testimony on the part of the defendant shows that nothing was said or done to provoke the difficulty, that both Lawrence and James Rogers had their knives open, that Lawrence's attempt to cut Willie Stallings was entirely unexpected, and that under these circumstances the shot was fired. When Lawrence Rogers fell an empty quart bottle fell out of his bosom. It had a few drops of whiskey in it. There was also evidence showing that on their way to Stallings' home the Rogers brothers had a bottle of liquor, that Lawrence took a drink from it, that they came in contact with R. J. Sexton and tried to get him to take a drink, but he was running from them at the time and ran in the house of one Needham Skipper.

On the trial many rulings were made and exceptions taken. We will discuss those insisted on in appellant's brief which seem to need discussion.

■ That afternoon, defendant testified, that he started down to Charlie Lowery's (which was farther down the Honoraville and Black Rock Road beyond the Butt's place where defendant stopped). His attorney asked him if his father sent him there. Objection was sustained and exception taken. It is not shown that his purpose in going there and that his father sent him were material to the issues. The fact that he went down the road and on that trip saw deceased and his brother, and what occurred in their relations, would seem to be the material matters in relation to that trip.

■ The court refused charge 9. Certain features of it are abstract. The defendant in shooting the deceased was not defending his home, and did not so claim, but claimed to be defending his father in the highway some sixty-five yards, more or less, from the home. The material elements of defendant's contention as to self-defense were fully covered by the court in his oral charge, and in giving charge 7 at defendant's instance.

Another contention is that the court erred in not allowing defendant to prove what he said to his father immediately after he returned from his trip down the road, while the others were eating supper, and when he refused to eat. The court was not informed what it was which defendant told his father, then sought to be proven. Defendant then went out on the back porch and sat there for awhile, when deceased and his brother came on up the road to the house, and the events then all led up immediately to the killing. Appellant insists that what he told his father, regardless of its import or substance, was admissible as a part of the res gestae of the killing, insisting that all the events, circumstances and conversations that occurred from the time defendant set out for Lowery's until the killing was a part of the res gestae.

We have approved the statement of a principle as applicable to that contention, which we quote as follows:

"In such trials, 'evidence of connected acts and transactions leading up to and explanatory of the killing is admissible. These acts and circumstances need not necessarily be a part of the res gestae, in the sense that they become a part of the crime itself, but they are admissible where they throw any light upon the actions, animus, or intent of the defendant, and in this case the mental attitude of defendant at the time of the fatal difficulty as bearing on the question of freedom from fault and required by defendant's plea of self-defense becomes very pertinent.' See, also, Weems v. State, 222 Ala. 346, 132 So. 711; Ford v. State, 71 Ala. 385; Cooley v. State, 7 Ala.App. 163, 62 So. 292; 16 Corpus Juris, 545, § 1040." McCoy v. State, 232 Ala. 104, 166 So. 769, 770. See, Laws v. State, 209 Ala. 174, 95 So. 819; Jordan v. State, 81 Ala. 20, 1 So. 577.

■ Unless the incident here referred to was a part of the res gestae it was admissible only to throw light on the actions, animus or intent of the parties when such actions, animus or intent are also relevant. In order to determine whether the communication to his father on that occasion was relevant and would throw light on the actions, animus or intent of defendant, it would be necessary to know what it was that defendant said to his father. Without that knowledge the court cannot be put in error on account of the ruling, notwithstanding section 445, Title 7, Code. Flowers v. Graves, 220 Ala. 445, 125 So. 659; Morgan Hill Paving Co. v. Pratt City Sav. Bank, 220 Ala. 683, 127 So. 500; Alaga Coach Line v. McCarroll, 227 Ala. 686, 151 So. 834, 92 A.L.R. 470; Strickling v. Whiteside, 242 Ala. 29, 4 So.2d 416.

■ If the communication in question was a part of the res gestae on the principle stated in Swinney v. State, 225 Ala. 273, 142 So. 562, the rejection of it as evidence will not cause a reversal of judgment, because not knowing what was proposed to be proven we have no way of determining whether the rejection of it as evidence

"probably injuriously affected substantial rights of" appellant. Supreme Court Rule 45, Code 1940, Tit. 7 Appendix; Berry v. Dannelly, 226 Ala. 151(12), 145 So. 663.

■ The principal purpose of this rule was to obviate the necessity of a reversal upon the presumption of injury whenever error was shown, and makes it incumbent upon appellant not only to show error but also that he was probably injured thereby. Kabase v. State, 244 Ala. 182, 12 So.2d 766; Henderson v. Tennessee Coal, Iron & R. Co., 190 Ala. 126, 129, 67 So. 414; Dorough v. Alabama Great Southern R. Co., 221 Ala. 305, 128 So. 602.

■ Error is urged in respect to the court's ruling as to that feature of the solicitor's argument in which he called attention to the fact that the sheriff's deputies who went to the scene of the killing to make an investigation brought back the dead man's knife, but did not bring back the shotgun or the whiskey bottle they found there to be used as evidence. Title 54, section 5(4), Code 1940, makes it the duty of the sheriff and deputies to secure evidence of crimes in their counties and report it to the solicitor. The two deputies were witnesses for defendant. The argument that the ruling was error is not because the comment was not within the evidence. If they did not bring back the whiskey bottle and gun they found there, the solicitor had the right to comment on that fact for what it might be worth. The fact that the jury may reject it as of little value does not tend to show error in overruling objection to it. This is different from commenting on the failure of defendant to produce witnesses in respect to a material matter. Waller v. State, 242 Ala. 1, 4 So.2d 911. In it there was no criticism of defendant for not offering those items but it was directed against the deputies for the purpose of shedding light on their evidence. As to this there was no error.

■ The great burden of the argument of counsel for appellant is to the effect that the motion for a new trial should have been granted because the verdict was contrary to the great weight of the evidence.

Without discussing the evidence or the principles of law by which we are con-

trolled in reviewing the ruling of the trial court in denying the motion we will only say that we do not think there was error in doing so.

We have considered this record in all its aspects, and have reached the conclusion that there is no prejudicial error shown.

Affirmed.

All the Justices concur.