33 So.2d 466

### GRANT v. STATE.
### 1 Div. 295.

Supreme Court of Alabama.
Jan. 22, 1948.

W. C. Beebe, of Bay Minette, and Forest Christian, of Foley, for appellant.

166

A. A. Carmichael, Atty. Gen., and Jas. T. Hardin, Asst. Atty. Gen., for the State.

STAKELY, Justice.

The appellant, Noel J. Grant, was indicted, tried and convicted of murder in the first degree. His punishment was fixed at death by electrocution. The appeal comes to this court under the automatic appeal act. General Acts 1943, p. 217 et seq., Code 1940, Tit. 15, § 382(1) et seq.

On March 9, 1947, state witness Ora Barton Ewing while driving back from Fort Morgan in Baldwin County discovered a human hand sticking out of the sand a short distance from the side of the road. He reported the matter to the authorities with the result that the body of a woman was dug up from a shallow grave in the sand. She had been shot three times. One wound was in the abdomen. One wound was in the leg. And one wound was in the breast at the clavicle.

Doctor Nelson E. Grubb, State Toxicologist, testified that the three wounds had

been inflicted in the foregoing order in point of time and that the last wound had proved to be the fatal wound, the first two wounds being superficial.

The body was identified as Gertha Grant, the wife of Noel J. Grant, the appellant. They resided at Pensacola, Florida. He was arrested in Pensacola, Florida, and subsequently turned over to the sheriff of Baldwin County, Alabama.

Noel J. Grant made a confession to the authorities at the jail in Bay Minette, which was reduced to writing and signed by him. The confession was introduced in evidence. He testified as a witness in his own behalf and in substance on the witness stand corroborated the statements contained in the written confession. The evidence showed that Noel J. Grant killed Gertha Grant in substantially the following manner.

On the morning of March 8, 1947, appellant and his wife, together with Richard, her seven year old son by a former marriage, left Pensacola in his car for a ride. They crossed into Alabama and passed through several Alabama towns, eating lunch in Fairhope, Alabama, and then having a sandwich in Brewton, Alabama. From Brewton they proceeded back to Florida. Shortly after 7 o'clock in the evening he stopped the car on the side of the road and when he got back in the car got his wife to turn her head to see if the door on her side of the car was closed. He then hit her twice upon the head with his pistol which he drew from his belt. His wife screamed and jumped from the car. He caught her, threw her to the ground and fired one shot into her body. He then placed her in the trunk of the car, re-entered the car and drove away. After driving a short distance, he stopped the car, raised the trunk lid, found that she was conscious. She asked him to let her out. Instead he fired another shot into her body and closed the trunk lid. He drove back into Alabama and disposed of the boy by luring him out of the automobile at a bridge over a stream. He then struck the boy in the head and pushed him off the bridge into the stream. Driving on he reached a filling station and stopped for gas, but hearing his wife moving in the trunk drove on. He again stopped, raised the trunk lid and after his wife spoke to him, he addressed certain remarks to her and fired a third shot into her body. She then fell over and made no more noise. The third shot was fired in Baldwin County, Alabama. He then obtained gasoline at the next filling station and from there drove to the point where he buried the body, scooping out the shallow grave with his hands. First, however, he removed her rings and watch. Then he drove back to Pensacola, stopping on the way to wash out the trunk of the car. The pistol with which the deceased was slain, together with her rings and watch, were found in the defendant's possession at the time of his arrest.

Appellant testifying, as stated, in his own behalf, admitted he killed his wife and buried her body where it was found. According to him, he did so because she had been guilty of "running around" with other men. The pleas of the defendant were not guilty and not guilty by reason of insanity.

We shall now proceed to discuss the various matters on which appellant bases his right to reversal, but none of which we deem sufficient to produce that result.

■ 1. The voluntary confession made by appellant included a statement that he knew he was going to have to get rid of Richard and since the boy asked him when he reached the bridge to let his mother out of the trunk because she was getting cold, he stopped the car and told Richard to get out of the car so that he could show him his mother was not cold, that he then got out his gun, hit Richard on the head and shoved him off the bridge into the water. It is insisted that on a prosecution for a particular crime, evidence which in any manner shows or tends to show that the accused has committed another crime independent of that for which he is on trial, is irrelevant and inadmissible. Clearly, however, the acts of appellant with reference to the boy were a part of the res gestae. It was part of the series of events leading up to the final fatal shot. The fact that under the circumstances the acts of appellant may tend to show another crime is immaterial. The evidence was competent. Kennedy v. State, 182 Ala. 10, 62 So. 49; Oakley v. State, 135 Ala. 15, 33 So. 23; Allison v. State, 1 Ala. App. 206, 55 So. 453; Sexton v. State, 239

168

Ala. 287, 196 So. 744; Barnes v. State, 31 Ala.App. 187, 14 So.2d 242, certiorari denied 244 Ala. 597, 14 So.2d 246. The state sought to show that when the defendant was arrested in Pensacola after the commission of the crime he was asked by the deputy sheriff, Owens, when referring to a little book satchel on the wall, "Do you reckon this kid will ever need this any more," to which the defendant replied, "No, he will never need it any more, because he had killed them both." The court expressly instructed the jury not to regard anything that the defendant said about killing the boy, and not to consider any injury to the child. Without considering whether this evidence was competent, we mention it to show that the court was careful to keep from the jury any testimony regarding the assault on the boy, except as it was a part of the series of events making up the res gestae.

■ 2. There was no error in allowing the boy Richard, aged 7, to testify for the state. He was first examined by the court and adjudged competent as a witness. His testimony was used solely to show that the dead woman was his mother, that she was the wife of the defendant and that he went on the ride in question with the defendant. The record is silent as to how he survived after being pushed off the bridge.

■ 3. The state introduced photographs showing the three wounds on the body of the deceased. It is claimed that this evidence showing a body in its condition after death was prejudicial and unnecessary. We have examined the photographs and think them competent. McKee v. State, Ala.App., 31 So.2d 656. The photographs show the three bullet wounds and tend to corroborate the testimony of the toxicologist that three shots were fired into the body of Gertha Grant. DeSilvey v. State, 245 Ala. 163, 16 So.2d 183; Grissett v. State, 241 Ala. 343, 2 So.2d 399.

4. The oral charge of the court did not include a charge on manslaughter. It is claimed that this constitutes error on the theory that there was evidence tending to show that the defendant killed the deceased in the heat of passion. While testifying in his own behalf, the defendant in describing the events connected with the fatal ride stated, "She tried to get her hands on the gun twice that day. The second time was when this tragedy taken place and I had been all unnerved." On cross-examination the defendant was asked, "How long was it before you shot her that she tried to get the gun—10, 15 minutes or 1 hour or 2 hours?" In answer to this question he replied, "A good little time. I didn't time it, but it was a good little while."

■ Omitting the consideration of testimony tending to discredit the foregoing testimony of the defendant and allowing for its lack of detail, we do not think that it tends to show that he killed in the heat of passion. According to his own testimony, she reached for the gun a "good while" prior to the slaying. This shows that a "cooling time" had intervened and precludes the contention that the defendant slew in the heat of passion. Whitehead v. State, 206 Ala. 288, 90 So. 351, 352; Ragland v. State, 125 Ala. 12, 27 So. 983; Brunson v. State, 212 Ala. 571, 103 So. 664. It should be kept in mind that in the case at bar, the defendant fired a bullet into his wife on three, separate occasions well spaced in point of time. There can be no possible room for contention that the second and third, which was the fatal shot, were fired under the heat of passion engendered by any act of deceased in reaching for a gun. Whatever might be said of the first shot, the evidence warranted the jury in finding that the latter shots were brutal, cold-blooded and premeditated.

■ Nor can it be said that he slew in the heat of passion because he suspected that his wife had had illicit relations with other men. In the case of Sheppard v. State, 243 Ala. 498, 10 So.2d 822, 824, in speaking of passion engendered in a man by his wife's unfaithfulness, this court said: "* * * If he does not strike and kill until after there has been time for his passion to cool and for reason to reassert itself, or if he strikes and kills immediately, but is not moved thereto by the heat of passion, but by prior malice, hatred, desire to avenge the wrong done him, or by any other motive, or upon any design whatever except such as is presently engendered by the paroxysm or rage into which he is

thrown by this extreme provocation, he is guilty of murder."

In this case it was held that "Under facts here disclosed, the law says the injured husband must reflect, must not brood over his hurt, then slay the wife or her paramour. If he does, he is guilty of murder. There was no error in declining to charge on manslaughter in this case." ·

In considering the exception to the oral charge, the evidence in the case on the issue of insanity may be divided into two parts, (1) testimony relating to the condition of the defendant prior to the ride and (2) testimony, including defendant's confession, as to the events occurring on the ride.

Five employees of the Florida Pulp and Paper Company, where the defendant was employed as a bus driver, sought to testify in his behalf. L. L. Gibson testified that defendant's work was satisfactory and there was nothing to indicate he didn't have a sound mind. Julius Norred testified that on about three occasions defendant had brought up the subject of his trouble with his wife, but there was nothing to lead him to believe that he was mentally unbalanced. J. D. Jones testified that defendant said he was having some trouble with his wife, but that he "would be afraid to say that he had noticed any peculiarities about him"; that he drove the bus all right so far as he knew. Frank Savage testified that as far back as September or October defendant told him that he suspected his wife of running around with other men, that at times he seemed to be in deep study and he wouldn't hear you, that he seemed agitated and worried, that he got more nervous and jumpy, that his mind would kinder of wander at times and at other times he would be all right, but in his opinion he was not a man of sound mind all the time. On cross-examination Frank Savage first testified that he thought that defendant's action in not noticing stop signs when driving the bus indicted an unsound mind, then stated that his mind wasn't on his business; that he had never been with him when he didn't know the difference between right and wrong; that when he was present defendant and his wife got along all right. W. E. Coleson testified that defendant talked with him about his family troubles, but no names were called; that defendant seemed to grow more "nervous jittery" and absentminded; that at times he had the impression he didn't know right from wrong because on one occasion he drove through a stop sign without stopping; that he was not familiar with crazy men and did not know about mental diseases. W. D. Moore testified that he had worked at the plant about two years previously and saw defendant frequently, but when he came back to work at the plant the second time, defendant did not know him; that there was a change in his mental condition, that defendant did not talk to him about his wife but he seemed worried all the time and just looked like he didn't have his mind, that sometimes he would talk continuously and sometimes he would not say a word, seeming to be in a daze, that in his opinion defendant was mentally unsound when he (witness) came back to work the second time. On cross-examination he testified that he drove the bus to and from the plant of the company and Pensacola about six times each day, the distance between these points being about 16 miles and that he could drive all right and he knew of no complaint about his work.

In addition to the above the defendant testified as to various incidents in his wife's relations with other men all of which took place prior to the ride. In all of this there was no proof of any actual wrongdoing. At best this testimony only tended to show ground for suspicion. The events on the ride have hereinabove been substantially set forth.

When insanity, which is the result of disease of the brain, is present at the time of the commission of the act and is the producing cause of the act, it is a good defense. It is not required, however, that such insanity shall have existed for any definite period, but only that it existed when the act occurred. 22 C.J.S., Criminal Law § 57. In referring to temporary insanity the court did not depart from the foregoing rule. Temporary insanity has a meaning which differentiates it from a condition caused by disease of the brain and confines

170

it to a condition due to causes other than disease, usually intoxication. Gunter v. State, 83 Ala. 96, 108, 109, 3 So. 600. See also 44 C.J.S., Insane Persons, § 8. In the present case, however, there was no proof of intoxication and if for that reason it is claimed that the charge was misleading to the point of injury, it is sufficient to say that when these parts of the charge are considered in the light of the entire charge and in connection with the evidence, there is nothing prejudicial. Supreme Court Rule 45, Code 1940, Tit. 7 Appendix; Bristow v. State, 24 Ala.App. 439, 136 So. 837, certiorari denied 223 Ala. 390, 136 So. 838.

■ Examination of such authorities as Wingard v. State, 247 Ala. 488, 25 So.2d 170, and Parsons v. State, 81 Ala. 577, 2 So. 854, 60 Am.Rep. 193, will show that the court correctly stated the well-known rules to sustain the defense of insanity. The charge also correctly showed that the law of this state does not sanction emotional or moral insanity as an excuse for crime. Wingard v. State, supra; Coffey v. State, 244 Ala. 514, 14 So.2d 122; Reedy v. State, 246 Ala. 363, 20 So.2d 528. Furthermore mere temporary mainia not the result of a disease of the mind does not constitute insanity. Braham v. State, 143 Ala. 28, 38 So. 919; Parrish v. State, 139 Ala. 16, 36 So. 1012.

■ We think that the evidence, if any, on which insanity as a defense must be rested is the testimony relative to defendant's condition prior to the ride. The evidence as to what occurred on the ride standing alone would not make out the defense. The charge shows that the testimony as to insanity before the ride to be available as a defense must be based on the fact of a diseased mind of a chronic or permanent nature because only insanity of that type would be presumed to exist when the ride was taken as distinguished from emotional or temporary insanity. Ford v. State, 71 Ala. 385; Parsons v. State, supra.

We have carefully examined the entire record and find no error.

Affirmed.

All the Justices concur.