46 So.2d 705

**KEITH v. STATE.**

8 Div. 518.

Supreme Court of Alabama.

June 1, 1950.

Jas. W. Woodroof, Paul T. Gish, Jr., and D. U. Patton, all of Athens, for appellant.

A. A. Carmichael, Atty. Gen., and Mac-Donald Gallion, Asst. Atty. Gen., for the State.

STAKELY, Justice.

Robert Atkinson lives on his place in the Green Briar district in the southeastern part of Limestone County. There is a house in his back yard about 75 to 100 feet from his home. Enos Foster lived in this house with his wife Canzella Foster. On Sunday, November 14, 1948, Queenie Clements, an old woman and the mother of Canzella Foster, was visiting with her daughter. Robert Atkinson left his home about 1 o'clock on this date and returned just after dark. Upon his return he found Queenie Clements lying dead right at the bottom of the steps to the house, in which Canzella Foster lived, while Enos Foster was found by him lying dead about 50 to 60 feet away and near the well house in the yard. Both had been bludgeoned about the face and head. Later that night about 11

P.M. Joe Keith (appellant), who also lived on the Atkinson place, was taken into custody by the authorities. There was blood on the shirt he was wearing. Subsequently he' signed a written statement confessing the killing of both Queenie Clements and Enos Foster.

Appellant was indicted for the murder of Queenie Clements. Trial resulted in a conviction and sentence of murder in the first degree. The death penalty was imposed. The appeal here is under the automatic appeal act.

Canzella Foster, witness for the state, testified in substance as follows. On the Sunday afternoon in question Joe Keith came to her house and found her husband Enos Foster standing in the door. She heard Joe say to Enos, "Mr. Bob wants some stuff moved out of the room." Enos wanted to know when he wanted the stuff moved and Joe said "Right now." Enos thereupon left with Joe and she never saw Enos alive again. In about 30 minutes after he first came to her house Joe came to her house a second time. She was cooking supper and Queenie Clements was seated at the table. It was now dark. When she saw Joe standing at the door, she took her lamp which she had lit and went to the door. He thereupon hit her with a piece of iron pipe and knocked the lamp out of her hand. He hit her three times on the neck and shoulder and while he was hitting her, Queenie ran to him. He then struck Queenie who fell to the floor. She then ran away "hollering, Lord, have mercy." According to Canzella, Canzella had no knife in her hand and made no attack on Joe. Tendencies of the evidence show that subsequently blood was found splattered on the floor.· A broken lamp chimney was also found on the floor.

There were no witnesses for the defendant as to the facts relating to the killing, but witnesses for the state gave another version of the killing. In substance the other version was as follows. On the Sunday afternoon in question Joe Keith was at the home of Wiley Glass with a number of others. Whiskey was being drunk and Joe Keith had more than his share. An altercation arose between Joe Keith and

Buddy Glass in which Buddy drew a knife on Joe. At the insistence of his sister and Lucie Rice, the girl with whom he was living, Joe left and then went with them to the home of his uncle where he tried to borrow a knife from Gloria Keith. She told him she had no knife and he soon left with Lucie Rice. Joe then went to the home of Robert Atkinson and pulled on a back window but it was not open. He picked up an iron bar and when he threatened Lucie she left. On cross-examination Lucie testified that after she left Joe she met Nellie Keith and they turned back to the house of Mr. Atkinson. She saw Joe and Canzella in some kind of fight between the house and the well. She saw Canzella hit Joe but did not see what Canzella had in her hand.

The written statement which Joe Keith signed contained among other things the following: "I live on Mr. Robert K. Atkinson's place. I had been down to Bus Warren's house with Frank Twitty (C. M.) drinking whiskey Sunday evening November 14th, 1948. I left there just after dark and came on to Alf Warner's. I stayed there about 15 minutes. I then came on to Ennis Foster house and called him out of the house. He lived behind Mr. Robert Atkinson's house about 75 feet East. I had a iron bar in my hands about 2-1/2 or 3 feet long and about 1 inch in diameter. Ennis came out and we walked up to the pump house. Me and Ennis was talking and then got to arguing. I took the iron bar and with both of my hands hit Ennis with all my might in the head, and he fell. I might have hit him again, I don't know. Ennis wife and Queen ran out with something in their hands. Ennis's wife grabbed him and was dragging his body. The other old woman made at me and I hit her in the head twice with the iron bar and she fell. I don't remember hitting Canzella Foster. I might have hit her I don't know. I think I dropped the iron bar close to the pump house or in Mr. Atkinson yard. * * * The blood on my· shirt is off of one of the people I killed. * * *."

Reversal is sought (1) for alleged error in connection with the organization of the grand jury, (2) rulings on the evidence and (3) the action of the court in refusing

a written charge requested by the defendant.

I. Section 30, Title 30, Code of 1940 provides in substance, among other things, that at any session of a court requiring jurors for the next session, the judge of the court shall draw from the jury box in open court the names of not less than 50 persons to supply the grand jury for such session etc. It is argued in the case at bar that the judge did not draw the names of the jurors from the jury box but in effect selected the names of certain jurors from the jury box. This defense was presented by plea in abatement and an issue made with respect thereto by replication filed by the state.

In the recent case of Rush v. State, Ala. Sup., 45 So.2d 761,[1] this court pointed out that while § 285, Title 15, Code of 1940 provides in effect that no objection can be taken to an indictment by plea in abatement or otherwise on any ground going to the formation of the grand jury except that the jurors were not drawn in the presence of officers designated by law, nevertheless this statute was designed to prevent quashing of the indictment for mere irregularities and to obviate resulting delays in the administration of justice. It was pointed out that the statute was not designed to nullify matters deemed essential to the established concept of trial by jury which offend basic principles of due process. See also Vernon v. State, 245 Ala. 633, 18 So.2d 388; Smith v. State, 34 Ala.App. 45, 38 So.2d 341, certiorari denied 251 Ala. 559, 38 So.2d 347.

There is no doubt that § 30, Title 30, Code of 1940, referred to *supra*, was designed to provide that the judge shall draw the names of the jurors from the jury box without selection by him in any way. And there can be no doubt that if there is a selection by the judge this would tend to indicate that jurors have been specially selected for a particular case and would thereby offend basic principles of due process. So we must look to the facts brought out in the evidence to see if there was a selection by the judge of jurors rather than an impartial drawing at random of the names from the jury box as required by law.

The facts shown by the evidence may be stated in substance as follows. On March 15, 1949, the trial judge, Hon. Newton B. Powell, in open court set the docket for the April term of the Circuit Court of Limestone County, Alabama. At this time a number of attorneys of the local bar were present and as soon as the Judge had set the docket he proceeded to draw the venires for the three weeks of court from the jury box. Both the setting of the docket and the drawing of the juries took place in the office of the Circuit Clerk in the Court House in Athens, Alabama. The sheriff and the clerk were present during the entire proceeding. Some of the attorneys who had been present when the docket was set remained for the drawing of the jurors.

The judge first unlocked and opened the jury box. He shuffled the cards in the box by putting his hands into it and lifting hands full of cards out of the box and then letting them slip through his fingers back into the box. He repeated this process of shuffling the cards a number of times during the drawing. While the judge was shuffling the cards some of them would fall on the desk on which the box was placed. He picked up these cards and with one exception placed them back into the box. After the first shuffling had been completed, the judge proceeded to draw the name cards out of the jury box for the first week of court. (The grand jury was later selected from the first week's venire.) He drew these cards out of the box singly. After drawing from three to five cards in this manner, he drew a group of three cards from the box which were clipped together. He looked at these cards and dropped them back into the box. There is evidence tending to show that the judge was in the process of shuffling the cards at the time he saw these three cards clipped together. The judge then proceeded to draw each card singly from the box and hand them to the clerk. After the drawing of the venire for the whole term, the judge closed the jury

box and locked it. At this time one of the attorneys present called the Judge's attention to the fact that one name card was lying on the desk by the side of the jury box. The evidence tends to show that this card probably fell to the desk during the shuffling of the cards. However it is not shown how long this card had been lying on the desk. The attorney picked the card up and handed it to the Judge. The Judge opened the box and placed the card into the jury box. Then he returned the box to the sheriff. At this time all of the attorneys who had been present during the drawing except the county solicitor left the clerk's office. Within a few minutes one of the attorneys who had just reached his office was telephoned by the county solicitor and requested to come back to the clerk's office. As soon as this attorney reached the clerk's office, the sheriff handed the jury box back to the trial judge. The Judge opened the box and reached his hands into the cards until he found the three cards which were clipped together. He drew these cards from the box, handed the cards to the clerk and requested that they be placed upon the venire for the first week of the court. This took place in the presence of both the sheriff and the clerk. No comment was made by any one present as to the names on these three cards at this time.

The proof shows that the jury commission of Limestone County had been at work on the jury cards some months prior to the drawing of the venire for this term of the court. The secretary of the circuit court clerk worked with the jury commission. The commission took some names from the jury box. She testified that she clipped three name cards together which had been drawn from the box by the commission. The commission had information that the cards which they took from the box and which were clipped together were the names of men who were dead or out of the county. She testified that one of the names which she clipped together was that of Carlyle Taylor. She further testified that she did not ever see any other name cards clipped together.

The three names of jurors which were drawn by the Judge at the second drawing

of the venire were placed on the bottom of the jury list for the first week of court. One of these names was Carlyle Taylor, who did not appear. One of these three names was Marvin Baker who was found and served.

There is testimony tending to show that there are hundreds of name cards in the jury box and that the judge drew the venire without looking in the box. There is also testimony tending to show that the jury box is kept in the vault in the offices of the Judge of Probate of Limestone County, Alabama, and that this vault at certain hours is open and accessible to the public. However the evidence tends to show that according to the knowledge of the probate judge the box had never been removed from the vault except by the sheriff or by the jury commission.

■ The issue made by the plea in abatement and the replication thereto was fully explained to the jury by the court in its charge to the jury. This issue was tried and submitted to the jury before evidence was taken and the case tried on the merits. The jury found the issue in favor of the state. We think the finding of the jury should stand. The three cards were evidently clipped together so as to be withdrawn from the jury box because the three persons named respectively on the cards were either dead or had moved outside the county. The court, therefore, at first determined that these names should not be placed on the venire, but when he saw that the legality of his act might be questioned, he drew these names out of the box again and ordered them placed on the venire. The second drawing of the three cards clipped together was not a selection, but merely a redrawing of cards already drawn in an effort to avoid legal question. We do not think that appellant has been injuriously affected. Rush v. State, supra.

■ II. It is insisted that proof of the killing of Enos Foster is inadmissible since the defendant is charged in the indictment with the murder of Queenie Clements and evidence of another crime is not within the scope of its allegations. There was no error in this regard. The killing of Enos Foster was so connected with the killing of

Queenie Clements as to make the one a part of the res gestae of the other. Grant v. State, 250 Ala. 164, 33 So.2d 466; Kennedy v. State, 182 Ala. 10, 62 So. 49, 51; Sexton v. State, 239 Ala. 287, 196 So. 744; Laws v. State, 209 Ala. 174, 95 So. 819. "Every fact and incident * * * of the one was competent * * * in illustration of the other." Kennedy v. State, supra; Jackson v. State, 229 Ala. 48, 155 So. 581; Terry v. State, 13 Ala.App. 115, 69 So. 370.

■ The chain of events beginning with the difficulty between appellant and Buddy Glass was admissible in evidence. After this altercation the jury had the right to infer that appellant was bent on revenge or further difficulty with Buddy Glass. He tried to procure a knife from Gloria Keith but did not get it. There is testimony that at the house where she lived he said, "Listen at Wiley Glass and them making up a plot they are going to kill me. I'll fix them all. Lucy are you going with me." She replied, "Yes" and "Then he led out running up toward Mr. Robert Atkinson's house." The evidence admits of the inference that he wanted to get into Mr. Atkinson's house to procure a weapon of some kind. When he reached the Atkinson house the difficulty with Enos Foster ensued and as a part of this difficulty or within a period of 30 minutes thereafter Queenie Clements was killed within a few feet from where Enos Foster was slain and according to tendencies of the evidence in the same manner. The chain of events beginning with the difficulty with Buddy Glass need not be a part of the res gestae in the sense that these events became a part of the crime itself, since they lead up to and tend to explain the acts, animus or intent of the defendant at the time he killed Queenie Clements. Stallings v. State, 249 Ala. 580, 32 So.2d 236; Sanders v. State, 242 Ala. 532, 7 So.2d 483; Jordan v. State, 81 Ala. 20, 1 So. 577.

■ III. Appellant takes the position that the confession claimed to have been made and signed by him was involuntary and void because of his race, lack of intelligence, inexperience and education and the way in which it was obtained. No evidence regarding the confession was introduced by the defendant and so we must consider carefully the evidence for the State. Before the court would permit the statement to be introduced in evidence, the State was required to account for the treatment of the defendant from the time he was taken into custody.

The defendant is a plantation Negro, 29 years of age. He was arrested at about 11 p. m. of the night of the killing while he was in bed at his home. He dressed and was taken by four or five officers to the county jail. The killing was not mentioned on the way to the county jail. When the jail was reached the defendant was taken into the receiving room, a room in size about 10 feet by 20 feet. In it were a table, several chairs and two cots. A number of officers from other counties were present when he was brought in but all left the room when he was examined and signed the confession, except R. A. Troup, a State Criminal Investigator, the Sheriff and one Deputy Sheriff. He was questioned by R. A. Troup, who wrote the confession which the defendant signed after it had been read to him and after he said it was correct. The confession was signed at about 12:30 that night.

Without conflict the evidence introduced by the state tended to show that no threats were ever made against the defendant, that he was not physically mistreated, that no reward or inducements were offered or held out to him in order to get him to confess. He was informed as to who his questioner was and that his answers could be used against him. He was 29 years old and apparently in good health. The extent of his education was not shown but he could sign his name and understood what he was doing. Without countervailing evidence of any kind the court acted correctly in admitting the statement in evidence. Phillips v. State, 248 Ala. 510, 28 So.2d 542; Hicks v. State, 247 Ala. 439, 25 So.2d 139; Arrington v. State, ante, p. 178, 43 So.2d 644; Odom v. State, ante, p. 571, 46 So.2d 1.

■ IV. Citing Wilson v. State, 243 Ala. 1, 8 So.2d 422, it is contended that the court erred in refusing to give requested charge 19, "If the jury believes from all

676

the evidence that Canzella Foster willfully and corruptly swore falsely as to any material fact, then they may disregard all of such testimony." There was no error in refusing this charge because of its misleading tendencies. The charge does not instruct that in the event the jury believes from all the evidence that Canzella Foster willfully and corruptly swore falsely as to any material fact, then they may disregard all of the testimony of Canzella Foster. On the contrary, under this charge, the jury might infer that they could disregard all of the evidence in the case. In addition to this we consider that refused charge 19 was substantially covered by given charge 14 as follows: "The court charges the jury that if they believe from all of the evidence that any witness has willfully sworn falsely as to any material fact in the case, then they may wholly disregard all of such testimony." Lawman v. State, 207 Ala. 419, 93 So. 69.

We have considered the entire record with great care and find no error therein. The judgment of the lower court must be affirmed.

Affirmed.

BROWN, FOSTER, LIVINGSTON LAWSON and SIMPSON, JJ., concur.