BOOKOUT, Judge.
Assault with intent to murder; sentence: twenty years imprisonment.
The offense in question took place at Atmore State Prison (now Fountain Correctional Facility) on January 18, 1974. The assault took place during a prison riot, which the warden testified that some inmates termed a “revolution.” The victim was inmate John Boykin, who was beaten and stabbed by rioting prisoners in the prison’s segregation unit.
Other inmates have also been tried as a result of the riot, assaults and killing of a correctional officer. Johnny Harris, a key participant was convicted of first degree murder pursuant to Title 14, § 319, Code of Alabama 1940, and sentenced to death. His conviction was affirmed by this Court on January 20,1976, and is now pending in the Alabama Supreme Court. Harris v. State, Ala.App. Likewise, this Court, on this date, affirmed the conviction of Oscar Lee Johnson on a charge of second degree murder, growing out of the same riot. Johnson v. State (1976), 58 Ala.App. -, 335 So.2d 663. Although the facts concerning the *680 instant appellant’s participation in the riot differ slightly from those in the Harris and Johnson cases, the propositions of law argued by the appellant are basically covered in our opinions in the other two cases.
The disturbance in question took place in the section of the prison designated as the “segregation unit” where prisoners are placed for refusal to obey prison regulations or for a serious infraction of the rules such as stabbing another inmate, possession of a weapon, or stealing.
Warden Harding testified that he was called to the segregation unit after the disturbance broke out, and he described what occurred:
“When I arrived at the window, the window was blocked out either by cardboard or cloth and I couldn’t see in. At that time I called for George Dobbins who was told to me that he was the leader of the revolution.
******
“. . . When I looked in, I asked him what the problem was. And I could see inmate George Dobbins and inmate Oscar Johnson, inmate Frank Moore and inmate Lincoln Heard.
******
“I asked inmáte Dobbins what the problem was and he said, ‘We don’t have a problem. You have a problem.’ Said, ‘We’re not bitching about the food; we are not bitching about the conditions of this prison but this is a revolution and we are all in this thing together.’
******
“. . . At that time I continued to ask him what his problem was and inmate Oscar Johnson was pecking on the window with a knife, prison-made knife, and he said to me: ‘Listen and listen good; we mean business. This is no game. Some of us may die today but before we do we are going to kill some mother-_pigs.’ .
******
“. . .1 asked them to be quiet so I could hear what George Dobbins had to say. And at that time inmate Lincoln Heard told me that I wasn’t talking to George Dobbins, that I was talking to all of them.”
The Warden said Dobbins told him, “We have already killed some snitches and house niggers,” and that the inmates dragged what appeared to be the dead bodies of Jewell Thomas and John Boykin down the hall on a blanket.
Warden Harding testified that the inmates, on order of Dobbins, brought Officer Arthur Dreadin, who was being held hostage, to the front and stood around him threatening to kill him. He stated that, “Oscar Johnson and George Dobbins and Frank Moore had prison-made knives. Inmate Lincoln Heard had a club or a night stick, looked like one of the officers’ night sticks.” Officer Dreadin shouted for help, and the law enforcement officers rushed the segregation unit. The Warden saw two of the inmates stab Officer Dreadin as the officers rushed into the unit.
The Warden further testified:
“A. They were throwing knives, pieces of commodes they had broken up, aerosol cans, anything they could get their hands, glass, (sic). They had broken glass out of the windows and throwing glass at us.
“Q. Did any of these inmates physically attack the officers who were going in there to subdue the riot?
“A. Whenever we was getting them out of the cells some of them would; I saw, I don’t know who the inmates was (sic) and now I don’t recall the officers, but I did see two inmates trying to envelop an officer with a mattress. This inmate, Lincoln Heard, threw a knife. That is the reason he got shot; he threw a knife. Leaned out the window and threw a knife out, down the hallway.”
Dr. James B. Thomas testified that in the late afternoon or early evening on the date of the riot, he treated inmate John W. Boykin, the victim of the assault charged in the instant case. Dr. Thomas described the *681 victim’s stab wounds which had collapsed his lungs. He testified that Boykin had a laceration over his left forehead that was sutured.
Inmate Jewell Thomas testified that during the riot George Dobbins came to his cell, accused him of being an informer and called for “five good brothers” to come into Thomas’ cell. He stated that the appellant, Lincoln Heard, and six other inmates stepped into his cell. They ordered him to get on his knees and when he refused, they ■started stabbing him. He suffered twenty-two stab wounds. He stated that he and. inmate John Boykin were drug down the hall to the lobby on a blanket for Warden Harding to see.
The victim, John W. Boykin, testified concerning the events during the riot. He stated that he was in his cell playing cards when he heard someone yell, “This is a revolution.” He said George Dobbins and some other inmates came down the hall saying that they were going to kill “all the house niggers, anybody that wasn’t participating.” He further testified:
“He went back up the hall and got Jewell Thomas and took him past my cell and in a few minutes later I heard Jewell holler ‘don’t stab me no more,’ and few minutes later they came back to my cell and George Dobbins said, ‘Nigger, is you ready to die?’ And then he hollered up front for Johnny to open the door. So the door opened, he stepped in and he turned around and said, ‘Give me four good revolutionary brothers. We are going to kill this nigger.’
* * * * * 4c
“ . . . So I saw Lincoln Heard and Bull Wilson then changing weapons. Bull Wilson gave Lincoln Heard a club and he gave Bull a pick. They entered into my cell. Lincoln Heard stepped up on the slab.
* * * * * *
“George Dobbins was the first one came in, then Oscar Johnson and Lincoln Heard and Bull Wilson. Anyway, I was standing up there talking to George Dobbins and he told me to get on my knees, I was going to die. I told him I wasn’t going to get on my knees. All of a sudden I looked up and saw the club coming down. Lincoln Heard hit me on the head with a club; I fell.
* * # # * * “They proceeded to stab me and George Dobbins said, ‘You all ain’t sticking that nigger deep enough. Stick him deeper.’ So I closed my eyes and shortly after that they stopped sticking me and left out of the cell. And George Dobbins and another guy came back to the cell and he told the guy to check my heart to see was I alive. So the guy told him, says, T can’t get to his heart.’ So George Dobbins said, ‘Well, he ain’t dead but he dieing (sic);’ said, ‘That is the way a house nigger suppose (sic) to die. Let him suffer.’ ”
Boykin was stabbed twenty-two times, but he lived to testify against his assailants, clearly identifying the appellant, Lincoln Heard, as a leading participant.
I
Appellant contends that his conviction should be reversed due to a systematic exclusion of blacks and women from the jury roll and venire from which the grand and petit juries were drawn. On the trial of Johnny Harris, arising out of the same prison riot, an almost identical motion was found to be insufficient to require the quashing of the indictment or reversal of the conviction. The same motion was filed during the trial of Oscar Lee Johnson with the same result and the same holding on appeal by this Court. Our decisions therein were based on Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759; Butler v. State, 285 Ala. 387, 232 So.2d 631; White v. State, 48 Ala.App. 111, 262 So.2d 313; and other cases cited in Harris and Johnson, supra. We reach the same result in the instant case.
*682 II
Appellant contends that the testimony of Jewell Thomas should have been excluded as its prejudicial nature outweighed its probative value.
The testimony of Jewell Thomas was brief. No objection was made until after he had testified that Lincoln Heard and six other inmates entered his cell, threatening to kill him. The following sequence occurred:
“Q. What happened when these six people you named came to the cell?
“MR. OWENS: I object to any further testimony along this line; not tied up, too remote to this time which is involved here.
“THE COURT: Did he say the Defendant was present on this occasion?
“MR. ROYER: Yes, Sir.
“THE COURT: I overrule.”
There was no motion made to exclude the testimony of Jewell Thomas at the end of his testimony and no motion to exclude the State’s evidence was made at the close of the State’s case in chief.
Our holding on this point is identical with our holding this date on the same issue raised in Johnson v. State, supra.
It is a well-established principle that evidence of other or collateral crimes is not admissible as substantive evidence to establish the guilt of an accused of a particular crime. To this well-established rule, there are several equally well-established exceptions. Wharton’s Criminal Evidence, § 31, lists them as follows:
“These exceptions fall under the following general divisions: (1) Relevancy as part of res gestae. (2) Relevancy to prove identity of person or of crime. (3) Relevancy to prove scienter, or guilty knowledge. (4) Relevancy to prove intent. (5) Relevancy to show motive. (6) Relevancy to prove system. (7) Relevancy to prove malice. (8) Relevancy to rebut special defenses. (9) Relevancy in various particular crimes. It is recognized that in many instances the line of demarcation is not clear, but the discretion vested in the trial judge, intelligently and considerately exercised, will enable the prosecution fully to present the charge, on the one hand, and, on the other hand, to protect the accused and . secure to him the rights guaranteed to him by the Constitution and the laws.”
See Murphy v. State, 52 Ala.App. 490, 294 So.2d 457; Brasher v. State, 33 Ala.App. 13, 30 So.2d 26, cert. denied 249 Ala. 96, 30 So.2d 31.
The stabbing of Jewell Thomas, as well as the other acts of violence enumerated in the evidence, were a part of the whole or same occurrence and thus could be considered by the trial court as relevant as a part of the res gestae. Also see McElroy, The Law of Evidence in Alabama, Vol. 1, § 69.01(3), p. 167; Keith v. State, 253 Ala. 670, 46 So.2d 705; Grant v. State, 250 Ala. 164, 33 So.2d 466.
III
Appellant alleges that the trial court erred to a reversal in denying his requests for discovery.
The same allegation dealing with a similar motion was treated at length in our decision in Johnson v. State, supra. In our decision on the Oscar Johnson appeal, we found no error on the part of the trial judge in denying a similar motion for discovery. For the same reasons enunciated in Johnson, we arrive at the same conclusion in the instant case. We cited in Johnson in support of our decision inter alia: Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215; Moore v. Illinois, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706; Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104; Shuler v. Wainwright, 5. Cir. 491 F.2d 1213; Davis v. Heyd, 5 Cir. 479 F.2d 446; McCants v. State, 282 Ala. 397, 211 So.2d 877.
IV
Appellant’s final allegation of error is that the cumulative effect of the inflam *683 matory remarks and tactics utilized by the State throughout the trial deprived appellant of due process.
We refused to reverse Oscar Johnson’s conviction on a similar allegation. In Johnson, comments on the part of the prosecution were made in a much more heated atmosphere that in the instant case. We have reviewed the matters complained of in the appellant’s brief in this regard, and find them totally without merit. Generally, improper conduct on the part of the prosecutor is not subject to review unless there is prompt, specific and appropriate objection by the opposing counsel, a ruling by the trial court, or a refusal of the court to rule on the objection. Anderson v. State, 209 Ala. 36, 95 So. 171; Espey v. State, 270 Ala. 669, 120 So.2d 904. We have often quoted our Supreme Court to the effect that a trial is a legal battle and not a parlor social affair. Arant v. State, 232 Ala. 275, 167 So.2d 540.
All of the grounds relied upon by the appellant for reversal have been considered in the light of the record, briefs and arguments of counsel, and we find that no reversible error has been shown. The record discloses that the case was fairly tried, that the judgment and sentence were supported by the evidence and the law. Counsel for appellant made a diligent effort both on trial and on appeal, however, the rulings of the trial court, challenged by appellant, did not constitute harmful error.
AFFIRMED.
TYSON, HARRIS and DeCARLO, JJ., concur.