This is another case growing out of the January 18, 1974 prison riot at the Atmore Prison in Escambia County. As a result of the assaults, and the killing of a correction officer, Luell Barrow, other inmates who participated in the so-called "revolution," have been tried and convicted.
Among the cases reviewed by this court, involving other inmates are: Harris v. State, Ala.Cr.App. [Jan. 20, 1976];Johnson v. State, 335 So.2d 663; and Heard v. State,335 So.2d 679 (hereinafter referred to as Harris, Johnson and Heard.)
Although the facts concerning this appellant's complicity in the stabbing death of the correction officer differ slightly from those in Harris and Johnson, they are almost the same. Only the pertinent facts will be outlined in an effort not to duplicate the facts already recited in Harris and Johnson.
However, in order to maintain a coherent recapitulation, some facts must be repeated.
The scene of the murder was the prison segregation unit, which refers to that section of the prison compound set aside for inmates who break rules set down by the prison authorities.
It was during the riot that correction officer Luell Barrow was being held hostage by some rioting prisoners. Appellant was among that group.
Marion Harding, the warden at the Atmore State Prison, was the first State witness. On the day of the disturbance, Harding received a communication that two inmates and two guards had been taken hostage. He went to the segregation unit where the hostages were held and spoke with inmate Dobbins. The conversation took place in the lobby of the unit, through a secured opening in a door leading into the area containing the cells.
Dobbins told the warden that: "`. . the revolution is on.'", and: "`We are ready and willing to die but we are going to kill some of you pigs to start with.'" All of the inmates, the warden saw, were armed and inmates, Johnson, Moore and Dobbins beat on the window with knives. Johnson told the warden: "`. . . we have already killed two people. We have killed some niggers and snitches, some house niggers and snitches and we are going to kill some of the mother f______ pigs before this is over with.'" At that point, Dobbins ordered they be brought up so the warden could see that they meant business. Two inmates were dragged in front of the opening on a blanket. Both were bloody and appeared to be dead. Subsequently, Officer Dreadin was brought to the front, his hands were tied behind his back and he was held at the collar by the appellant, Grover McCorvey. Officer Dreadin was asked by the inmates, if he believed they would kill him and he replied: "`Yes, I do.'" Then Officer Dreadin was taken back to the cell block by appellant and Johnson.
When cardboard was placed over the window, the warden moved to another window where he saw Officer Dreadin sitting on a food cart surrounded by appellant, Heard and Dobbins, who had knives in their hands. An inmate called to Warden Harding: "`Come on in. We are ready to die. We are going to kill some you mother f______ too.'" When Harding tried to talk, Dobbins ordered that, "`. . . one of those mother f______ pigs . . .'" be brought to the front so the warden could see they meant business. It was at this time the warden heard some scuffling and Officer Dreadin call out: "`Come on in and get us, they have killed one of us and they are killing me now.'" At that point, Officer Dreadin appeared at the door and Johnson, Heard and Moore stabbed him. Guards were ordered into the unit and the riot was quelled.
Jewell Thomas, an inmate, testified that during the riot, Dobbins came into his cell and asked him whether he was with them or not. After Thomas asked, in what?, Dobbins said: "`kill these two bitches'" referring to Officers Dreadin and Barrow. When Thomas replied, "no way," Dobbins *Page 1055 
stepped from the cell into the hall and called: "`Give me five good brothers.'" Beasley, Wilson, Harris, Johnson and the appellant appeared and entered Thomas' cell. All were armed with knives and Dobbins ordered Thomas to get on his knees. When Thomas refused, Dobbins stabbed him in the arm and then the others began stabbing him. When Thomas fell to the floor, the group left the cell. Thomas stated that during the period the inmates were out of his cell, he saw appellant and Johnson pass his cell, carrying bloody knives. When they returned they rolled Thomas in a blanket and dragged him to the front, along with another inmate, on another blanket. When they reached the entrance, Dobbins told the warden: "`here is two of your snitches.'"
When the disturbance was over, Thomas was taken to a hospital where he was told he had been stabbed twenty-two times.
Arthur Dreadin, the correction officer held hostage, along with Officer Barrow, testified that just prior to the disturbance, he and Officer Barrow had completed the feeding of side two of the unit when Harris brought some trays into the unit and bumped Officer Barrow. When Dreadin turned, Johnson appeared and placed a knife at his throat while Harris held a pick at Officer Barrow's back. The cell keys, along with the officer's belongings, were taken. All the cells were unlocked in the unit.
After being bound, the officers were taken to the lobby and placed on a food cart. The inmates told the officers they were going to cut their heads off and roll them down the hall, to show they meant business.
Dreadin stated that along with Harris and Johnson, Moore, Heard and the appellant were involved in taking them hostage.
When the officers were taken to the window where the warden was standing, appellant placed a knife at Officer Dreadin's throat and held him up to the window by his collar. Afterwards, the officers were taken into cell one, which contained inmates Heard and Dobbins. Subsequently, Johnson, Harris and the appellant came to the cell. Officer Dreadin was standing immediately in front of Officer Barrow when he heard him groan and saw him slump to the floor. At that point, Dreadin shouted: "come and get us . . . `They done killed Mr. Barrow and they [are] stabbing me.'" Dreadin ran from the cell to the front lobby. It was at this time that the warden led the guards into the hall.
After the riot, Dreadin was taken to a hospital where he remained for seven days. He had sustained twenty-six stab wounds, one of which collapsed his lung.
After a motion to exclude the State's evidence was overruled, the appellant called Claude Harris, an inmate confined in the segregation unit at the time of the disturbance. On the day in question, after being released from his cell, Harris walked to the lobby and heard Dobbins making a request for certain people to be brought to the prison. He then walked to the back of the segregation unit where he saw the defendant for the first time that day. When Harris started to return to the lobby, he heard the guards entering the unit.
Larry Shepherd, another inmate in the segregation unit, was the next witness called. On the day of the riot he saw the defendant in the back hallway standing on a wooden crate, looking out a window. Shepherd was in the back of the unit about five or ten minutes before the guards came into the segregation unit. He admitted dragging Jewell Thomas to the front lobby but stated he did not see the appellant. Shepherd saw inmates with clubs, spikes and knives, but did not see the appellant with any weapon.
James D. White, a correctional counselor, saw appellant just before the riot ended. White was at the back door of the segregation unit when he saw the defendant stick his head around a corner in response to his announcement for inmates to come to the back lobby if they wished to surrender.
Appellant testified that on the day of the disturbance, he was confined in the segregation unit and had been there for almost a year after refusing to work, due to the fact he was under a doctor's care. McCorvey *Page 1056 
was asleep when the riot started but the noise woke him. After standing in front of his cell for about five minutes, he went to the lobby where he saw Dobbins talking to the warden. Approximately five minutes later, he went to the back of the segregation unit where he climbed on a crate to be near a window in the event tear gas was thrown.
Appellant maintained he remained by the window during most of the disturbance. He denied holding Officer Barrow up to the window where the warden could see him, and denied going into the cell where Officer Barrow was stabbed. McCorvey said he did not stab Jewell Thomas and maintained he did not have a knife during the disturbance. He stated it was his intention to surrender, when he heard the guards come in with shotguns, and decided against it.
McCorvey also complained he was beaten and shot in the face during the disturbance.
Appellant contends the facts presented by the State were not sufficient to convict him under the theory he was an aider and abettor in Officer Barrow's murder. After a close review of the testimony outlined above, we find the evidence was sufficient to present the question of appellant's complicity to the jury.
Many other instances of error were raised in the brief by appellant, but all, with the exception of the sufficiency of the evidence question and four other issues, were addressed by this court in Harris, Johnson and Heard.
The four other issues peculiar to this case are:
 I
First, the appellant maintains the withholding of statements by White and Shepherd, violated his right to discovery and the court was in error in not granting a mistrial.
In our review of the record, we found the trial judge had prior to the trial, read all the statements taken by the investigators. Some seventy or eighty statements were made available to the trial court for examination. Nowhere is it argued that the statements of Officer White and inmate Shepherd were not among them.
Appellant argues the statements by White and inmate Shepherd were of an exculpatory nature, yet, this precise question was before the trial judge when he determined what statements would be turned over to the defense.
This court in Thigpen v. State, 49 Ala. App. 233,270 So.2d 666, stated:
 "`. . . it is within the discretion of the trial court as to whether a prosecuting officer will be compelled to turn over to the defense written notes made by officers during the investigation of a crime.'"
This rationale covers the point of contention here. From what appears in the record, the exculpatory natures of White's and Shepherd's statements were considered by the court and the judge determined they were not of that persuasion. See also:Daniels v. State, 49 Ala. App. 654, 275 So.2d 169.
Without some showing of abuse in the court's determination that they were not in fact exculpatory, we fail to see that error existed.
 II
Appellant also insists his statement taken by a State investigator should have been turned over to him and the failure to produce it was a violation of his due process right to fundamental fairness.
It does not appear, from what we can glean from the record, to be a statement as such, adopted or signed by appellant. The so-called statement seems to be the product of an investigator's interview with appellant. A substantial portion of it was denied by the appellant and the rest was said to be the answers of the investigator, not those of the appellant.
From our examination of the transcript, this seems to be a part of the investigator's product in the investigation and not a subject of discovery under Thigpen v. State, supra. *Page 1057 
 III
Appellant complains his challenge for cause to a prospective juror should have been sustained. Counsel argues the intended juror knew Officer Dreadin, the only witness for the State, who placed the defendant at the scene of the crime.
To disqualify a prospective juror, he must have more than a bias, or fixed opinion, as to the guilt or innocence of the accused. Such opinion must be so fixed as that it would bias the verdict a juror would be required to render. Hammil v.State, 90 Ala. 577, 8 So. 380.
The grounds for challenge by either party to prospective jurors in civil or criminal matters are enumerated in T. 30, § 55, Code of Alabama 1940, Recompiled 1958. Under this section only that portion concerned with bias or prejudice would cover appellant's intended challenge.
In the present case, the bias necessary to disqualify was only intimated. See: Hammil v. State, supra. It was not shown that the juror would, because of having known the witness, or due to this relationship with him, have been biased against this appellant.
The court made the necessary inquiry of the juror regarding this relationship and was told the fact that she knew Officer Dreadin, would not affect her judgment.
Under the foregoing we do not find error in the court's ruling.
 IV
Finally, it is asserted that the trial court erred when it denied the appellant adequate medical treatment and a hearing on his competence to stand trial. Counsel argues that appellant's medical condition was such that without the medical care requested and a sufficient time before trial for recovery, his constitutional rights to due process and equal protection were violated.
About three months before the trial, the court received a motion from defense counsel requesting a medical examination and treatment for the appellant. Counsel alleged this was necessary to enable the appellant to be able to assist in his defense.
In support of this motion, counsel had a letter from appellant which stated in substance: That during the riot he had sustained numerous blows to the ribs and head and due to either the blows or a gunshot wound, he had suffered a fractured skull. Further, the medical treatment he had received had been inadequate and consisted of an x-ray, one visit from the doctor and some pills which appellant said were aspirin. Appellant insists that due to these injuries, he has poor eye-sight and suffers "Black-out spells" which causes his mind to go blank for days.
After receiving this motion, the judge made an inquiry concerning the appellant's allegations of mistreatment to the Commissioner of Prisons.
In response to this inquiry, he received a letter from Dr. James B. Thomas, physician in charge of administering medical care for the Fountain Correctional Center and Holman Prisons. From the record we find that the court acted after receiving an affidavit from Dr. Thomas, who examined and treated the appellant. He stated that the appellant had not suffered a fractured skull and that he could not find any indication of a gunshot wound. Appellant was x-rayed and treated at the local prison hospital and after appellant's release, either Dr. Thomas or a member of his qualified medical staff, saw him regularly. The doctor stated, in his opinion, appellant's allegations were all in error and that the injuries received by the appellant would not cause "passing-out spells." Also with this affidavit, were x-rays and an x-ray report which stated no fractures or abnormalities were visible.
It was on the basis of the affidavit and the x-ray report that the judge denied the motion and in our judgment, he was correct.
No error appears in the record.
AFFIRMED.
TYSON, HARRIS and BOOKOUT, JJ., concur. *Page 1058