McMILLAN, Presiding Judge.
Shonda Nicole Johnson was convicted of the capital offense of “murder when the victim is subpoenaed, or has been subpoenaed, to testify, or the victim has testified, in any preliminary hearing, grand jury proceeding, criminal trial or criminal proceeding of whatever nature, or civil trial or civil procedure of whatever nature, in any municipal, state, or federal court, when the murder stems from, is caused by, or is related to the capacity or role of the victim as a witness.” § 13A-5-40(14), Ala.Code 1975. Specifically, Johnson was charged and convicted of intentionally causing the death of Randy McCullar by shooting him, or causing him to be shot, by aiding and abetting Timothy Richards in the shooting, after McCullar had testified before a grand jury on behalf of the State of Alabama in a bigamy case against Johnson; the murder stemmed from or was related to McCullar’s role as a witness. Following a separate sentencing hearing before the jury, it recommended that Johnson be sentenced to death by a vote of 11 jurors in favor of death and 1 juror in favor of life without parole. The trial court then conducted a separate hearing and sentenced Johnson to death.
*1104 After the final sentencing hearing before the trial court, the judge issued his sentencing order that contained his findings of facts summarizing the crime and Johnson’s participation therein; the sentencing order stated:
“In the early morning hours of November 30, 1997, David O’Mary, a vice president of First National Bank of Jasper, was traveling down Alabama Highway 195 in Walker County. As he drove past the Harmony Missionary Baptist Church, he noticed what appeared to be a man lying next to a parked car in the church parking lot. He noticed that the man was not moving and pulled into the parking lot to investigate. Upon approaching the person, O’Mary noticed that the man had gray color to his complexion. Upon further investigation, he saw that the man had been shot and was, in fact, dead. He notified the authorities of his discovery.
“Two nights prior to this discovery, the defendant, Shonda Johnson (Richards), and her co-defendant/husband, Tim Richards, were having Thanksgiving dinner at the home of Audrey Gray, the sister of Mr. Richards. At the conclusion of the meal and as they were about to leave, the defendant, Shonda Johnson, stated that she and her husband were going ‘headhunting’ and stated that they had a gun in the back of the car. The defendant, Shonda Johnson, and her husband, Timothy Richards, on an earlier visit, discussed the fact that Randy McCullar (later the victim in this matter) was taking the defendant back to court to get custody of their son, Chad. In the conversation, in the presence of Mrs. Gray, there was some mention of the defendant, Shonda Johnson, being raped by Mr. McCullar. When Mrs. Gray realized that they were serious, she told her brother ‘not to be stupid.’
“The Saturday after Thanksgiving, 1997, the defendant and Timothy Richards hired a babysitter and went to the Kooler, a restaurant in Jasper, Alabama. They asked for a menu, but were told that the kitchen was closed. They went back to them apartment in Jasper. After a while they both decided to go to the BC Lounge, a Jasper night spot. The defendant had told Richards that Randy McCullar would leave the lounge at 12:00 to 12:30 A.M. and that would be a good time to get rid of him.
“When they arrived at the BC Lounge they spotted [McCullar’s] car. Timothy Richards got out of his car and sliced the tire of McCullar’s car. McCullar came out of the lounge. He appeared to be drunk. He got in his car and drove away from the parking lot. At this point the couple lost McCullar. They drove around Jasper until they found him at the Omelet Shoppe in Jasper. When McCullar left the Omelet Shoppe, they followed him traveling north on Highway 195 toward Double Springs in Winston County.
“At a point the defendant, Shonda Johnson, saw that McCullar had pulled into a church parking lot. They turned around, went to the parking lot of the church, and pulled up to McCullar. Words were exchanged between Johnson and McCullar. Johnson had put shells in the rifle when they were en route following McCullar. As they pulled up to the scene, she ‘bolted the shells into the chamber.’ She then ‘shoved’ the weapon into the hands of Richards. She said, ‘[D]o it, do it, get it over it.’ Richards then pointfed] the gun at the head of McCullar and fire[d] the gun. While backing out of the parking lot, the defendant, Johnson, was laughing and smiling.
*1105 “Johnson and Richards retened to their apartment in Jasper. After a while in the apartment, they both got in the car and drove to Littleton’s bridge near Good Springs, Alabama. Richards threw the rifle off the bridge into the river. They later did the same thing with the gun case at Baker’s Creek, which is located in the same area of the county.
“They again returned to their apartment[.] Shonda Johnson wanted to have sex, but Richards could not handle it. Richards stayed up all night. Johnson went to sleep.
“Prior to her ‘marriage’ to Tim Richards, the defendant had a live-in relationship with Ronnie Webb. This relationship started in September 1996. After about a month into this relationship, Randy McCullar took a warrant for the defendant charging her with bigamy. After this occurred, the defendant constantly wanted ‘somebody to do away with Randy McCullar or have something done with him’ according to Webb. At one point in this relationship the defendant talked about killing McCullar. She even suggested that Webb get some dynamite and do it right then.”
The record indicates that Johnson gave a number of varying statements to the police, originally denying the existence of her marriage to McCullar or any involvement in his murder. Subsequently, with each successive statement, she confessed to increased involvement in the murder, particularly as more evidence surfaced implicating her. Richards also originally denied any involvement in McCullar’s murder and he secured an alibi for Johnson and himself through his sister in Tuscaloosa. However, he also eventually admitted to being involved in the murder, although both Johnson and he indicated that the other was the primary wrongdoer. Richards entered into a guilty-plea agreement with the State and testified against Johnson at trial.
Concerning McCullar’s role as a witness before the grand jury on the bigamy charges against Johnson, the record revealed that on June 24, 1995, Johnson and McCullar participated in a wedding ceremony conducted by the preacher from McCullar’s church. Just before the ceremony, McCullar contacted the preacher and indicated that he was quite upset because he had learned that Johnson’s divorce was not final and would not be final before the wedding ceremony took place. The preacher agreed that the ceremony would be a “practice” ceremony, and he informed McCullar that Johnson and he should come to the preacher’s home after Johnson’s divorce was final to again take the vows and be legally wed. On July 11, 1995, a marriage certificate for McCullar and Johnson was filed in the Winston County Probate Court Clerk’s office. The couple remained together only a matter of months, and, on September 29,1995, Johnson married William Hayward McIntyre, Jr., while still legally married to McCullar. Therefore, McCullar filed a bigamy complaint and obtained an arrest warrant against Johnson. Johnson was arrested and subsequently indicted for bigamy by the Winston County grand jury. McCullar had been listed as a witness on the arrest warrant against Johnson, and he testified before the grand jury during its proceedings. There was testimony McCullar was considered the prosecutor’s main witness in the bigamy case and, further, that without his testimony it would be extremely difficult to gain a conviction against Johnson for bigamy. It was during this time that Johnson attempted to enlist the help of Ronnie Webb and David Prescott to hurt or kill McCullar. On May 10, 1997, while still legally married to McCullar, *1106 Johnson married Tim Richards; Johnson insisted that they go to Gatlinburg, Tennessee, to be married. Richards knew nothing of Johnson’s prior marriage to McCullar. Shortly after their marriage, Johnson began prompting Richards to kill McCullar. On November 6, 1997, McCul-lar filed for a divorce and, as part of the divorce complaint, he sought custody of his child, Chad McIntyre, and requested a DNA paternity test. After McCullar had filed the bigamy charges against Johnson, he received a large legal settlement resulting from an automobile accident with a logging truck, wherein he had suffered serious injuries. Johnson had informed Richards of the settlement and had told him that, should McCullar die, the money would go to Chad or to her. In late November 1997, just following Thanksgiving, Johnson and Richards planned and carried out the shooting death of McCul-lar.
Johnson argues that the trial court erroneously admitted evidence of a prior conviction and prior bad acts of Johnson. Specifically, Johnson argues that evidence and testimony concerning her conviction for bigamy, testimony concerning her adulterous relationships, and testimony by Richards that she solicited him to beat up another man that she had dated was inadmissible. She further argues that, if that evidence was admissible, she was entitled to a limiting instruction informing the jury that it could not consider the evidence as an indication of bad character or to show her propensity for criminality.
We will address the admissibility of that evidence and testimony in Part I of this opinion. The need for a limiting instruction as to that evidence and testimony will be discussed in Part II.
I.
Johnson claims that improper evidence and testimony was admitted concerning her conviction for bigamy; she refers specifically to the testimony by the deputy district attorney of Winston County concerning the evidence found to establish probable cause to support the bigamy complaint, the proof of warrants filed in the case, Johnson’s arrest for bigamy, and her guilty plea to the crime. Johnson further complains that documents supporting that testimony were improperly introduced, and that Richards was allowed to testify concerning the same evidence. Johnson argues that the State needed only to prove that she had committed murder after McCullar was subpoenaed to testify or had testified in a grand-jury proceeding or criminal proceeding, and that the murder stemmed from his capacity as a witness; the State did not need to prove, Johnson argues, that she was “actually a bigamist, or was convicted of bigamy,” Johnson’s brief at p. 12, which she claimed to be irrelevant. Similarly, she argues that Richards’s testimony concerning her adulterous relationships with other men, specifically David Prescott and Ronnie Webb, was irrelevant and unduly prejudicial; she contends that that testimony was introduced solely to show her bad character. Finally, she disputes the admissibility of testimony from Richards concerning the alleged solicitation by Johnson to have Richards assault David Prescott, a man Johnson had previously dated and who had been a friend of Richards’s.
The State argues on appeal that the evidence of the bigamy prosecution, as well as the evidence of the bad acts by Johnson, were properly admitted because they made up the res gestae of the offense and were relevant to prove Johnson’s motive and intent to commit the capital murder.
“While the general rule is that evidence of separate crimes is inadmissible *1107 where the only probative function of such evidence is to show bad character, or an inclination or propensity to commit the type of crime for which accused is being tried, if the accused’s commission of another crime or misdeed is an element of guilt, or otherwise tends to prove his guilt, then proof of such other crimes or misdeeds is admissible.”
Twilley v. State, 472 So.2d 1130, 1134 (Ala.Crim.App.1985) (citation omitted).
“[E]vidence of collateral crimes or bad acts is admissible as part of the prosecutor’s case if the defendant’s collateral misconduct is relevant to show his guilt other than by suggesting that he is more likely to be guilty of the charged offense because of his past misdeeds.”
Bush v. State, 695 So.2d 70, 85 (Ala.Crim.App.1995), aff'd, Ex parte Bush, 695 So.2d 138 (Ala.1997).
Although evidence of other crimes, wrongs, or acts may not be admitted into evidence to show bad character or that the person acted in conformity with this prior behavior, there are a number of limited purposes for which such evidence may be admitted. Rule 404, Ala. R. Evid.; Charles W. Gamble, McElroy’s Alabama Evidence, § 69.01(1) (5th ed. 1996). Moreover, while Rule 404(b) provides a number of exceptions to the exclusionary rule, this list “is not fixed or exhaustive.” Gamble, McElroy’s Alabama Evidence, § 69.01(1) (5th ed. 1996).
The res gestae or “complete story” exception has been explained as follows:
“(3) Res gestae, continuous transaction, complete story or inseparable part of charged crime.
“Evidence of the accused’s commission of another crime or act is admissible if such other incident is inseparably connected with the now-charged crime. Such collateral misconduct has historically been admitted as falling within the res gestae of the crime for which the accused is being prosecuted. Most modern courts avoid use of the term ‘res gestae ’ because of the difficulty in measuring its boundaries. The better descriptive expression is perhaps found in the requirement that the collateral act be contemporaneous with the charged crime. This rule is often expressed in terms of the other crime and the now-charged crime being parts of one continuous transaction or one continuous criminal occurrence. This is believed to be the ground of admission intended when the courts speak in terms of admitting other acts to show the.‘complete story’ of the charged crime. The collateral acts must be viewed as an integral and natural part of the circumstances surrounding the commission of the charged crime.
“Two theories have been adopted for justifying the admission of collateral misconduct under the present principle. Some courts hold that such contemporaneous acts are part of the charged crime and, therefore, do not constitute ‘other crimes, wrongs, or acts’ as is generally excluded under Rule 404(b). Other courts hold that Rule 404(b) is applicable to these collateral acts but that they are offered for a permissible purpose under that rule — ie., that such acts are merely offered, rather than to prove bad character and conformity therewith, to show all the circumstances surrounding the charged crime.”
McElroy’s Alabama Evidence, § 69.01(3) (footnotes omitted).
Also relevant in the instant case is the exception to the exclusionary rule pursuant to which prior bad acts or offenses may be admitted as proof of motive. That exception has been explained as follows:
“(7) Motive.
*1108 “Evidence of the accused’s commission of another crime or act is admissible if it tends to show a motive to commit the now-charged crime. Motive has been described as that state of mind which works to ‘supply the reason that nudges the will and prods the mind to indulge the criminal intent.’
“While this exception to the general exclusionary rule has had its most active application in cases in which the accused is being tried for homicide and the relevant motive is malice, there are many other motives at work in criminal cases and as to which extrinsic crimes or acts my be relevant. Such arise, for example, when the accused commits the charged crime with the motive of concealing the collateral misconduct or satisfying some financial need.”
McElroy’s Alabama Evidence, § 69.01(f) (footnotes omitted).
Furthermore, in McElroy’s Alabama Evidence, the extent of evidence of details concerning the earlier bad acts or offenses that may properly be admitted at trial is discussed as follows:
“[T]he prosecution and the accused are sometimes appropriately precluded from proving the details of a former difficulty between the victim and the accused. Such preclusion, however, should not be applied when the former difficulty is considered as not being a separate difficulty but as being a part of a running altercation which steadily and rapidly leads up to the final difficulty in which the charged homicide and assault occurs. It has been stated affirmatively that a party can prove the details of a former difficulty if such difficulty and the difficulty giving rise to the homicide or assault are considered to be parts of one continuous transaction. Some decisions have conceived the rule as being that the details may be proven if the former difficulty is within the res gestae of the charged homicide. However, your author would respectfully submit that use of the phrase ‘res gestae’ in connection with the one continuous transaction rule contributes nothing to clarity and serves only to confuse the doctrine. The Courts have not defined the term ‘one continuous transaction.’ However, it is clear that the earlier difficulty may be deemed a part of the one continuous transaction culminating in the charged homicide or assault even though the earlier difficulty is to some extent separate from the final difficulty. In determining whether the earlier difficulty is a part of one continuous transaction, it appears that the courts consider the following factors:
“(1) The nearness and time and place of the earlier to the time and place of the final difficulty; (2) whether the earlier and the final difficulty arose from the same cause or dispute and (3) whether such nearness of time and place and identity of dispute warrants an inference that the passion generated by the earlier difficulty probably continued with unabated heat to the time of the final difficulty.”
McElroy’s Alabama Evidence, § 45.07 (footnotes omitted).
Moreover, pursuant to McElroy’s Alabama Evidence, § 45.06(9), when the charge against the accused involves a conspiracy theory, full details of a former difficulty between the accused and the victim are admissible. “The power of the prosecution in proving a conspiracy charge has traditionally been a rather inclusive and wide-sweeping one.... [A]s tending to prove the accused’s complicity as a co-conspirator in assault upon another, the State may prove the full details of a former difficulty between the accused and the victim.” Id. (Footnote omitted.)
*1109 In the present case, the State was required to prove, as an element of the capital offense, that McCullar was a witness and that there was a causal relationship between the intentional murder and McCullar and his role as a witness. The State also charged Johnson under a complicity theory. Therefore, it was incumbent upon the State to prove McCullar’s role as a witness before the grand jury in the bigamy case and that that role caused Johnson to intentionally and wilfully murder or aid in the murder of McCullar.
The details of Johnson’s bigamy were admissible proof of motive. Evidence that a murder was committed in order to conceal another offense has been held as admissible evidence of motive.
“In Harden v. State, 211 Ala. 656, 101 So. 442, it was said that ‘if there is any evidence tending to support a reasonable inference that the homicide was committed to conceal another crime, evidence of such other crime is admissible.’
“Certain it is that the evidence in this case tends to show that the person who placed the little girl in the lake did so in an effort to conceal the fact that she had been sexually molested, which fact is clearly established by the evidence.”
Duncan v. State, 278 Ala. 145, 172, 176 So.2d 840 (1965).
 Moreover, proof of the details of the earlier adulterous relationships wherein Johnson attempted to solicit her partners to assault or murder McCullar were admissible as proof of the unbroken chain of events leading up to the homicide; this included evidence indicating that she had enlisted their support through sympathy, by claiming that McCullar had raped and beaten her, and that she had navigated these men on numerous occasions by McCullar’s home in order to prompt action.
“The rule has been stated many times by the appellate courts of the State that in a prosecution for homicide, evidence of connected acts and transactions leading up to and explanatory of the killing is admissible. Byrd v. State, 257 Ala. 100, 57 So.2d 388 (1952); Keith v. State, 253 Ala. 670, 46 So.2d 705 (1950); Levert v. State, 252 Ala. 308, 42 So.2d 532 (1949); Stallings v. State, 249 Ala. 580, 32 So.2d 236 (1947); McCoy v. State, 232 Ala. 104, 166 So. 769 (1936); Jordan v. State, 81 Ala. 20, 1 So. 577 (1886); Golden v. State, 39 Ala.App. 361, 103 So.2d 52, reversed on other grounds, 267 Ala. 456, 103 So.2d 62 (1958); Sexton v. State, 28 Ala.App. 59, 180 So. 729 (1937); Newman v. State, 25 Ala.App. 526, 149 So. 724 (1933); Roberts v. State, 25 Ala.App. 477, 149 So. 356 (1933).
“For example, in Byrd v. State, supra, the Supreme Court of Alabama stated:
“‘It is true, however, that where there is an unbroken chain of events beginning with a prior difficulty and leading up to the killing, the chain of events leading up to the killing need not be a part of the res gestae in the sense that these events become a part of the crime itself but they are admissible since they lead up to and tend to explain the acts, animus or intent of the defendant at the time he committed the killing’
“In Newman v. State, supra, the Alabama Court of Appeals stated:
“ ‘In a prosecution for homicide, evidence of connected acts and transactions leading up to and explanatory of the killing is admissible. These acts and circumstances need not necessarily be a part of the res gestae, in a sense that they become a part of the crime itself, but they are admissible where they throw any light upon the acts, animus or intent of the defen *1110 dant, and in this case the mental attitude of the defendant at the time of the fatal difficulty as bearing on the question of freedom from fault. ...’ (Emphasis added.)
“In the case of Sexton v. State, supra, the Court of Appeals held that evidence of details of a prior difficulty between the deceased and the defendant was admissible in a murder prosecution, to show whether the defendant was in fact an accessory, and not the principal. The Court stated:
“ ‘The actions and circumstances need not necessarily be a part of the res gestae, in the sense that they become a part of the crime itself, but they are admissible where they throw any light on actions, crimes, or intent of the defendant, or his mental attitude at the time of the fatal difficulty, and his participation therein as being an accessory.’
“(Emphasis added.)”
Twilley v. State, 472 So.2d at 1135-36.
“If evidence of the accused’s commission of another crime is admissible, the state may prove in meticulous detail the manner in which the accused committed such other crime. Nelson v. State, 511 So.2d 225, 234 (Ala.Cr.App.1986), aff'd, 511 So.2d 248 (Ala.1987), cert. denied, 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988); Weatherford v. State, 369 So.2d 863 (Ala.Cr.App.), cert. denied, 369 So.2d 863 (Ala.), cert. denied, 444 U.S. 867, 100 S.Ct. 141, 62 L.Ed.2d 91 (1979); McElroy’s, Section 69.02(8).”
Bush v. State, 695 So.2d 70, 85 (Ala.Crim.App.1995), aff'd Ex parte Bush, 695 So.2d 138 (Ala.1997).
In the present case, the evidence concerning Johnson’s prior adulterous relationships, including a photo album and a videotape of Johnson’s marriage to McCul-lar,[1] and the testimony concerning Johnson’s escalating threats and proddings to enlist a male aid to “take care of’ McCul-lar, were admissible. Although those acts were not strictly a part of the res gestae of the murder, they tended to explain and relate to the killing; those acts were a part of one continuous transaction wherein the murder became the culmination of all of the circumstances. While somewhat peripheral, those acts were all links in the chain of events culminating in the murder.
Moreover, while the evidence concerning the bigamy case displayed Johnson’s motive in murdering McCullar, the evidence concerning the solicitations were demonstrative of this motive.
“In Whitehead v. State, 777 So.2d 781 (Ala.Crim.App.1999), aff'd, 777 So.2d 854 (Ala.2000), this Court stated:
“ ““ “ ‘Testimony going to show motive, though motive is not an element of the burden of proof resting on the State, it is always admissible.’ ... Even slight evidence to show motive for doing the act in a criminal case, is not to be excluded but should be left to the consideration of the jury.” ’ ” Siler v. State, 705 So.2d 552, 556-57 (Ala.Cr.App.1997), quoting, Giddens v. State, 565 So.2d 1277, 1281 (Ala.Cr.App.1990).’
*1111 “777 So.2d 781, 824-25.
“An attempt to avoid charges stemming from another incident can certainly be considered motive to commit homicide. See generally, Whitehead, supra.
“In Lovett v. State, 491 So.2d 1034 (Ala.Crim.App.1986), this Court stated:
“‘“Facts or declarations to be admissible under the principle of res gestae must be substantially contemporaneous with the main fact under consideration and so closely connected with it as to illustrate its character, Dudley v. State, 185 Ala. 27, 64 So. 309 [ (1914) ]; Jackson v. State, 177 Ala. 12, 59 So. 171 [ (1912) ]; Moss v. State, 190 Ala. 14, 67 So. 431 [ (1914) ]. It is true, however, that where there is an unbroken chain of events beginning with a prior difficulty and leading up to the killing, the chain of events leading up to the killing need not be a part of the res gestae in the sense that these events became a part of the crime itself, but they are admissible since they lead up to and tend to explain the acts, animus or intent of the defendant at the time he committed the killing. Keith v. State, 253 Ala. 670, 46 So.2d 705 [ (1950) ]; Smith v. State, 253 Ala. 220, 43 So.2d 821 [ (1950) ]; Collins v. State, 138 Ala. 57, 34 So. 993, 994 [ (1903) ].” Byrd v. State, 257 Ala. 100, 103, 57 So.2d 388, 390-91 (1952).’
“491 So.2d at 1036-37.”
Baird v. State, 849 So.2d 223, 238 (Ala.Crim.App.), writ denied, 849 So.2d 251 (Ala.2002).
Johnson also cites as error the trial court’s allowing into evidence testimony by Richards that Johnson promoted or prompted an altercation between Richards and David Prescott, with whom Johnson had previously had an adulterous affair.[2] However, that evidence, although not directly linked to the instant offense, was relevant and material because it helped to explain the relationship between the co-conspirators and illustrated the nature of Johnson’s conduct as a catalyst in the murder. At the time of the offense, both Richards and Johnson were in the car; however, while Richards pulled the trigger of the murder weapon, Johnson was an active participant by prodding, urging, and aiding Richards in the commission of the murder. Her ability to manipulate Richards into violence on her behalf helped to explain the conspiracy. Thus, early in her relationship with Richards, she was able to successfully prompt Richards to threaten David Prescott, whom Johnson had seen romantically just before her relationship with Richards, by telling him that Prescott was coming by their house regularly attempting to regain her attentions. She also told Richards that Prescott would stare at her and attempt to get her attention when they were in the same restaurant or drinking establishment. Richards testified that, although he was never a witness to any of this flirtation by Prescott, Johnson repeatedly informed him of Prescott’s advances. Eventually, Richards left a note on Prescott’s vehicle threatening him and telling him to stay away from Johnson.
“The power of the prosecution in proving a conspiracy charge has traditionally been a rather inclusive and wide-sweeping one.” C. Gamble, McElroy’s Alabama Evidence, § 45.01(9). Thus, in Twilley v. State, supra, the State properly introduced evidence of the hostile and menacing be *1112 havior exhibited by Twilley and his friends, not only against the victim and his group of friends, but also among themselves, as well as against a dog that Twilley threw off a bridge. Twilley v. State, 472 So.2d at 1136. This Court stated:
“The jury was fully justified in concluding from the actions of appellant and his companion, Billy Crowe, that being well fortified with alcohol, they were spoiling for a fight. The jury could have reasonably concluded that their conduct was calculated to provoke someone, anyone, in the group of fishermen to stand up to them in order to satisfy their desire to engage in a brawl. The conduct of appellant referred to above, including publicly urinating on the highway and throwing the dog off the bridge, definitely tends to throw light upon and explain his state of mind, disposition, actions, motive, animus, and mental attitude at the time of the fatal difficulty. In view of his defense that he was grabbing the deceased in order to protect him from the knife being wielded by Billy Crowe, his antecedent conduct bears upon the question of freedom from fault and whether he was an aider and abettor in the commission of the crime. The intent and disposition with which one does a particular act must be ascertained from his acts and declarations before and at the time.”
Twilley v. State, 472 So.2d at 1136-37.
Similarly, in the instant case, Johnson’s defense was that Richards was the instigator and sole perpetrator of the offense. Although she was present in the car, she submitted that she had no role in the murder. Therefore, evidence of her manipulation of Richards was relevant to show her state of mind, motive, and intent at the time of the offense.
“In Jordan v. State, [81 Ala. 20, 1 So. 577 (1886) ], the Court stated:
“ ‘In respect to the relevancy of evidence, the general rule is, that it must be confined to the points in issue, and no circumstance is admissible, which does not tend to establish a fact material to the prosecution or defense, or from which no presumption or inference can be reasonably drawn in reference to a material fact or inquiry involved in the issue. It is often difficult to determine when a fact or circumstance is too remote to aid the jury in arriving at a conclusion on the issues to be tried. But it may be said generally, that all parts of one continuous transaction, though not shown to have any immediate connection with the offense — the culmination of all the circumstances — and facts, proximate to the consummation of the crime, which tend to shed light on the main inquiry, are admissible.’
“In Jordan, the court held that under an indictment for murder, it being shown that the homicide was committed at a house where all the parties, with others, were engaged in a frolic where there was dancing and drinking, all the occurrences of the evening may be regarded as constituting one continuous transaction, and are admissible in evidence.”
Twilley v. State, 472 So.2d at 1136. See also Hunt v. State, 659 So.2d 933, 940 (Ala.Crim.App.1994), aff'd, Ex parte Hunt, 659 So.2d 960 (Ala.1995) (wherein the capital-murder defendant’s statements that he was “on drugs” tended to explain his behavior and were, therefore, admissible).
Moreover, the evidence concerning the prior bigamy conviction, Johnson’s adulterous affairs, the wedding book and videotape of her marriage to McCul-lar, and her solicitation of Richards to assault David Prescott were more probative than prejudicial in this case.
*1113 “ ‘ “ ‘Judicial inquiry does not end with a determination that the evidence of another crime is relevant and probative of a necessary element of -the charged offense. It does not suffice to see if the evidence is capable of being fitted within an exception to the rule. Rather, a balancing test must be applied. The evidence of another similar crime must not only be relevant, it must also be reasonably necessary to the government’s case, and it must be plain, clear, and conclusive, before its probative value will be held to outweigh its potential prejudicial effects.’ ” Averette v. State, 469 So.2d 1371, 1374 (Ala.Cr.App.1985), quoting United States v. Turquitt, supra [557 F.2d 464] at 468-69 [ (5th Cir. 1977) ]. “ ‘ “Prejudicial” is used in this phrase to limit the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial.’ [citation omitted.] ‘Of course, “prejudice, in this context, means more than simply damage to the opponent’s cause. A party’s case is always damaged by evidence that the facts are contrary to his contention; but that cannot be grounds for exclusion. What is meant here is an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one.” ’ ” Averette v. State, supra, at 1374.’
“Robinson v. State, 528 So.2d 343, 347 (Ala.Cr.App.1986), cert. denied, (Ala.1988) (evidence of alleged ‘staged’ burglary held admissible in murder trial). See also Smith v. State, 447 So.2d 1327, 1329 (Ala.Cr.App.1983), aff'd, 447 So.2d 1334 (Ala.1984) (evidence of illegal drinking and gambling in ‘shothouse’ where victim was killed held properly admissible, since the entire facts leading up to the victim’s death “were so inextricably intertwined therewith as to be part of the res gestae’).”
Smith v. State, 581 So.2d 497, 523 (Ala.Crim.App.1990), reversed on other grounds, Ex parte Smith, 581 So.2d 531 (Ala.1991).
In the present case, the evidence of Johnson’s prior bad acts and her prior conviction were not only “reasonably necessary” to the State’s case, id., it was highly necessary to prove the conspiracy, McCullar’s role as a witness and that that role resulted in his murder, Johnson’s state of mind at the time of the offense, and Johnson’s motive in committing the offense. Moreover, the evidence concerning Johnson’s adulterous affairs was not unduly or unfairly prejudicial, because it related to Johnson’s conviction for bigamy, Johnson’s motive, and the conspiracy theory.
II.
Johnson further argues that even if the evidence discussed in Part I of this opinion was properly admitted, she was entitled to a limiting instruction by the trial court to the jury as to the limited use in deliberations. The State argues that this argument must be analyzed pursuant to the plain-error rule, Rule 45A, Ala. R.App. P., because the defense counsel failed to object on this ground at trial. Johnson claims to have raised the matter when defense counsel objected as follows:
“[Defense counsel]: One other objection, we’d ask the Court to make a limiting instruction to the prosecution in this ease with regard to specific evidence to be offered in the bigamy case, the only fact that would be relevant to this action is whether Mr. McCullar actually testified and that this witness saw it. Beyond that, I don’t see — ”
*1114 The record indicates that Johnson was arguing that the prosecution should not be allowed to introduce any evidence concerning the bigamy case, other than the fact that McCullar had testified before the grand jury. No objection was made concerning limiting instructions to the jury. A review of the record reveals no other request by Johnson for limiting instructions concerning the evidence. Therefore, any error by the trial court in failing to give such limiting instructions sua sponte would have to rise to the level of plain error.
“ ‘ “To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s ‘substantial rights,’ but it must also have an unfair prejudicial impact on the jury’s deliberations.” ’ Ex parte Bryant, 951 So.2d 724, 727 (Ala.2002) (quoting Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998)). In United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the United States Supreme Court, construing the federal plain-error rule stated:
“ ‘The rule authorizes the Courts of Appeals to correct only “particularly egregious errors,” United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982), those errors that “seriously affect the fairness, integrity or public reputation of judicial proceedings,” United States v. Atkinson, 297 U.S. [157], at 160, 56 S.Ct. 391, 80 L.Ed. 555 [ (1936) ]. In other words, the plain-error exception to the contemporaneous-objection rule is to be “used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.” United States v. Frady, 456 U.S., at 163, n. 14 [102 S.Ct. 1584].’ ”
Ex parte Martin, 931 So.2d 759, 767 (Ala.2004).
In the present case, the trial court gave no form of limiting instruction concerning how the jury was to limit its consideration of the evidence concerning Johnson’s prior bad acts. Although that evidence was admissible under the motive and continuous-transaction exceptions to the exclusionary rule, as well as to prove a conspiracy, there was a substantial amount of evidence of Johnson’s bad acts introduced and emphasized by the prosecution in their arguments and examination of witnesses, as well as in their exhibits. The State introduced exhibits concerning Johnson’s first marriage to Jeff Nelson, which had lasted from 1987 to 1993, as well as her marriage to Jimmy Tidwell, which had lasted from 1994 to 1995. Both of those marriages were before the time she met McCullar, but the evidence of those marriages emphasized the large number and rapidity of Johnson’s relationships. The State also introduced the wedding book and videotape of Johnson’s marriage to McCullar which, although admissible under the exclusionary rule, contained, as pointed out during the testimony of one of the investigating officers, Johnson’s description of certain sexual practices between her and McCullar. The State also introduced evidence indicating that McCul-lar and Johnson had had a child and that when McCullar filed for divorce in October 1997, he also sought custody of the child and a paternity test to prove that the child was his.[3] Johnson’s questionable abilities as a mother were also raised by the State in an effort to prove that she also manipulated her son. Thus, evidence was admit *1115 ted indicating that McCullar received a settlement in October 1997, pursuant to a logging-truck accident he had been involved in late 1995, and that Johnson was aware of that settlement. There was evidence indicating that Johnson had stated that, if McCullar died, the money from the settlement would go to his son or to Johnson. There was also evidence that Johnson married William McIntyre in 1995 and that it was that marriage that McCullar challenged with bigamy charges. The State then introduced, arguing that the acts were part of a continuing transaction, evidence of Johnson’s physical relationship ■with Ronnie Webb, whom, to no avail, she repeatedly urged to assault McCullar. According to Webb’s testimony Johnson suggested the use of dynamite to harm or kill McCullar. The State then introduced evidence indicating that Johnson became involved with Webb’s friend, David Prescott, and that she led Prescott to believe that she was carrying his baby, although her pregnancy was actually a result of her physical relationship with Webb. The State introduced evidence indicating that Johnson subsequently married Richards in May 1997 and began manipulating him by telling him that Prescott, with whom she had had a prior relationship, was still approaching her in attempts to rekindle their affair. The State also introduced evidence indicating that the statements to Richards concerning Prescott resulted in threats being made by Richards towards Prescott to refrain from seeing Johnson. Finally, in order to prove McCullar’s role as a witness, as well as Johnson’s motive in the murder, the State introduced evidence of the bigamy conviction, including an oversized depiction of Johnson’s guilty plea to the bigamy charge.
While, as we previously found in Part I, evidence of each of those bad acts and the conviction was admissible for a limited purpose under the general exclusionary rule and could only be considered for that purpose, the jury was never instructed as to that scope of consideration. The State argues on appeal that no limiting instruction was required because the evidence of the prior bad acts and the conviction were not admitted to impeach Johnson and because no limiting instruction is required when the evidence of the prior bad acts or conviction establish intrinsic facts of the present offense rather than collateral matters.
As this Court observed in Woodard v. State, 846 So.2d 1102 (Ala.Crim.App.2002):
“ ‘Evidence of collateral crimes is “presumptively prejudicial because it could cause the jury to infer that, because the defendant has committed crimes in the past, it is more likely that he committed the particular crime with which he is charged — thus, it draws the jurors’ mind away from the main issue.” Ex parte Drinkard, 111 So.2d 295, 296 (Ala.2000).”
Moore v. State, 878 So.2d 328, 334 (Ala.Crim.App.2003). “ When the prior conviction and the charged act are of a similar nature, the danger [of unfair prejudice] increases.’ United States v. Shapiro, 565 F.2d [479], 481 [ (7th Cir.1977) ]. ‘[I]f the prior conviction is similar to the new charges, the jury may misuse the prior conviction as evidence of guilt.’ ” Moore v. State, 878 So.2d at 340 (wherein it was held that, despite limiting instructions, the jury could not be held to avoid drawing the inference that the past conviction suggested a probability that the defendant committed the present similar offense).
In Ex parte Minor, 780 So.2d 796 (Ala.2000), the defendant, who was convicted of the capital murder of an infant who had died as a result of shaken-baby syndrome, argued that the trial court committed re *1116 versible error by failing to give sua sponte a limiting instruction to the jury concerning the admission of evidence of prior convictions of the defendant for assault in the second degree, possession of cocaine, and rape in the second degree, which was used to impeach the defendant’s testimony. In Ex parte Minor, the trial court failed to give any viable limiting instructions to the jury concerning the use of those prior convictions. The Alabama Supreme Court framed the argument raised by the defendant as “whether, absent a request or an objection by the defendant, the trial court has a duty to instruct the jury that evidence of prior convictions is not to be considered as substantive evidence of guilt.” Ex parte Minor, 780 So.2d at 800. The Court found: “We hold that the trial court does have such a duty in a capital-murder case.” Id. While Ex parte Minor concerned a situation wherein the prior convictions were introduced as impeachment evidence, the language of the decision extended the holding in Minor to other situations wherein prior bad acts or convictions was admissible for only limited purposes. The Court stated:
“[Ejvidence of prior convictions is admissible only for limited purposes. ‘The basis of the rule lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them. Most agree that such evidence of prior crimes has almost an irreversible impact upon the minds of the jurors.’ Cofer [v. State, 440 So.2d 1121, 1123 (Ala.1983) ] (quoting Charles W. Gamble, McElroy’s Alabama Evidence, § 69.01 (3d ed. 1977)). The general exclusionary rule ‘protects the defendant’s right to a fair trial’ by seeking ‘ “to prevent conviction based on a jury belief that [the] accused is a person of bad character. The jury’s determination of guilt or innocence should be based on evidence relevant to the crime charged.” ’ Cofer, 440 So.2d at 1123 (citation omitted). Thus it naturally flows that the trial court should take all necessary precautions to ensure that when evidence of a defendant’s prior convictions is admitted into evidence, the jury is properly instructed on the purpose for which it may consider that evidence. This includes instructing the jury, sua sponte, that it may not consider the evidence of prior convictions as substantive evidence that the defendant committed the charged offense.”
Ex parte Minor, 780 So.2d at 802. The Alabama Supreme Court found the rationale for this holding to apply to any situation wherein evidence of prior bad acts should be admitted only for a limited purpose, in order to protect a defendant from the inherently prejudicial use of such bad acts to imply bad character or that the defendant had committed the instant offense. The Court framed its holding in broad terms, encompassing any use of evidence of such bad acts admissible only for limited purposes. The Court stated:
“The trial court did not tell the jury that the evidence of Minor’s prior convictions could not be considered as substantive evidence that he committed the crime charged. Because the jurors were not so instructed, they were free to consider the prior convictions for any purpose; thus they could consider the probability that Minor committed the crime because he had demonstrated a prior criminal tendency. Allowing the jury to make such use of the evidence was highly prejudicial and constitutes reversible error. See Randolph v. State, 348 So.2d 858 (Ala.Crim.App.1977) (conviction reversed because the trial court failed to adequately distinguish between impeachment evidence and substantive evidence).
*1117 “The failure to instruct the jury in a capital-murder case as to the proper use of evidence of prior convictions is error, and that error meets the definition of ‘plain error.’ That is ‘so obvious that [an appellate court’s] failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.’ Ex parte Womack, 435 So.2d 766, 769 (Ala.), cert. denied, Womack v. Alabama, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983).”
Ex parte Minor, 780 So.2d at 803.
The following year, the Alabama Supreme Court revisited its decision in Ex parte Minor, supra, and somewhat limited the scope of that decision. In Snyder v. State, 893 So.2d 482 (Ala.2001), the Court reviewed the reversal of a capital-murder conviction by the Alabama Court of Criminal Appeals, where the reversal had been based on the trial court’s failure to instruct the jury that evidence of prior convictions that was used to impeach the defendant could not be considered as substantive evidence that the defendant had committed the crimes for which he was charged. Snyder v. State, 893 So.2d 471 (Ala.Crim.App.2001). The Alabama Supreme Court distinguished the facts from those in Ex parte Minor, supra, stating that in Minor “the trial court issued only a vague instruction to the jury on the use of evidence of the prior convictions — in this ease, the trial court’s instruction properly limited the jury’s consideration of the evidence of Snyder’s prior conviction.... ” Snyder, 893 So.2d at 483. The Court noted that the instruction that had been given by the trial court was a correct statement of the law and limited the jury from considering the prior-conviction evidence for any purpose other than evaluating the defendant’s credibility. Id. The main opinion in Snyder construed the holding in Ex parte Minor as not having established a per se rule, noting that whether the trial court had erred should be determined on a case by case basis. Snyder, 893 So.2d at 485. The Court further distinguished the holding in Ex parte Minor by finding that, although the evidence of the prior conviction in Snyder was also presumptively prejudicial, its impact, unlike in Ex parte Minor, “was not egregious.” Snyder, 893 So.2d at 485. The Court reasoned that the prosecutor asked a sole question concerning the prior conviction and in no way emphasized it during his closing argument. Id. Thus, the Alabama Supreme Court found no plain error in Snyder, because the trial court did give limiting instructions to the jury, which were proper instructions, and informed them that they could only consider the evidence of those convictions as it related to the defendant’s credibility.
“Here, the trial court properly instructed the jury as to the purpose of the evidence of Snyder’s prior conviction. If an instruction clearly informs the jury of the sole purpose of prior-conviction evidence — the witness’s credibility — it is reasonable to assume that the jury would not use the evidence for any other purpose. See, e.g., Taylor v. State, 666 So.2d 36 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996) (recognizing that jurors are presumed to follow instructions). Unlike the circumstances in Ex parte Minor, where the jury could have used the testimony for whatever purpose it desired — to determine a witness’s credibility or as substantive evidence of the defendant’s guilt — the trial court in this case informed the jury that the prior conviction evidence had ‘one purpose’ and that that purpose was to determine credibility; consequently, it eradicated the necessity of informing the jury that it would be improper to use the evidence as substantive evidence of guilt. The *1118 unambiguous instruction adequately cautioned the jury, explicitly stated the sole purpose of the testimony, and eliminated the risk that the evidence would be used improperly. Therefore, the emphasis in the instruction on the one purpose of the evidence overcomes a finding that the alleged error ‘has or probably has adversely affected the substantial right of [Snyder].’ Rule 45A, Ala. R.App. P. To hold that the trial court is required to inform the jury that prior-conviction evidence cannot be used as substantive evidence, would unnecessarily limit the trial court’s discretion in forming jury instructions, would restrict defense counsel’s trial strategy, cf. United States v. Barnes, 586 F.2d 1052, 1059 (5th Cir.1978), and in certain circumstances may unnecessarily emphasize the prejudicial evidence. Therefore, while the instruction to the jury must state either that prior-conviction evidence can be used only for the purpose of assessing a witness’s credibility or state that such evidence may not be used as substantive evidence of the defendant’s guilt of the crime charged, it is not reversible error per se if the trial court does not instruct both as to the admissible purpose of the prior-conviction evidence and the purpose for which such evidence may not be considered, unless counsel requests such a two pronged instruction and the instruction is supported by the evidence.”
Snyder, 893 So.2d at 486-87. Thus, the holding in Snyder finds that plain error does not lie in capital murder cases where the jury is properly instructed either as to the admissible purpose of the prior-conviction evidence or as to the purpose for which that evidence may not be considered, unless the evidence supports the giving of both instructions upon request by defense counsel.[4] See Peraita v. State, 897 So.2d 1161 (Ala.Crim.App.2003) (wherein the trial court did not err in allowing the State to introduce evidence concerning prior convictions despite the defendant’s stipulation, because the probative value of the evidence outweighed its prejudicial effect; the trial court limited the information concerning the prior convictions that the State could present to the jury; and “[finally, it gave thorough limiting instructions as to the purposes for which the jury could use the evidence about the prior convictions.”) See also Daniel v. State, 906 So.2d 991 (Ala.Crim.App.2004) (wherein evidence of prior convictions was properly admitted to impeach the defendant’s credibility because its prejudicial effect was diminished because the offenses were different from the capital offense for which the defendant was being tried and because the trial court clearly instructed the jury that they could not use the prior-conviction evidence as substantive evidence of guilt, but rather the only purpose for which the evidence of prior convictions could be used was to impeach *1119 the defendant’s credibility). Compare Ex parte Vaughn, 869 So.2d 1090 (Ala.2002) (wherein the majority opinion held that the trial court’s limiting instruction concerning the jury’s use of prior-conviction evidence failed to cure the error of allowing improper evidence, which did not fall within an exception to the exclusionary rule, to be presented before the jury; however, in a dissent, Justice Brown opined that the evidence of prior acts did fall within an exception to the exclusionary rule and that the extensive instructions concerning the limited purpose for which the evidence of bad acts could be considered and the purposes for which the evidence of the acts could not be considered eradicated any error).
In the present case, the trial court gave no limiting instructions concerning the use of the evidence of Johnson’s prior bad acts to the jury. The jury was neither informed as to what limited purposes the evidence could be considered nor informed as to what purposes the evidence could not be considered. After hearing and seeing all of the evidence of Johnson’s sexual relationships and manipulations, it is highly probable that the jury could have used that information to determine that Johnson was of bad character and poor morality. Because in this case the jury may have, without having been instructed otherwise, based its conviction on its belief that Johnson is a person of bad character, we cannot say that Johnson received a fair trial. Because we find plain error in the absence of limiting instructions informing the jury of the proper purposes for which the evidence could be considered or the purposes for which that evidence could not be considered, the judgment of the trial court is due to be reversed and the cause remanded for a new trial.
REVERSED AND REMANDED.
COBB and BASCHAB, JJ., concur. SHAW and WISE, JJ., concur in the result.

. The photo album and the videotape of Johnson's marriage to McCullar were introduced to show the progress of the investigation of this murder as it led to Johnson becoming a prime suspect. Johnson originally gave a statement wherein she claimed that she had never been married to McCullar. She thereafter gave a statement indicating that, although she had married McCullar, she had only done so under duress; she indicated that McCullar wielded a weapon at the ceremony. The album and the videotape refuted this statement.

. There was also evidence indicating that Richards and Prescott had been friends before Richards began dating Johnson.

. The State introduced evidence indicating that all of Johnson’s children were fathered by different men.

. In one dissenting opinion, the Ex parte Minor holding was stated to be clearly "that a trial court committed plain error if it failed to instruct the jury that it may not consider the evidence of prior convictions as substantive evidence that the defendant committed the charge offense. This should not change'on a case-by-case basis.” Snyder, 893 So.2d at 487 (Houston, J., dissenting). In another dissenting opinion, a Justice reasoned that the proper limiting instruction must be given specifically informing the jury that they could not use the evidence of prior convictions to be considered as substantive evidence of the defendant’s guilt; rather, it could only be used concerning credibility, because "[wjhile lawyers and judges, learned in the law, might understand this instruction to prohibit consideration of the prior convictions as substantive evidence of the defendant's guilt, the laypersons on the jury could not realistically be expected to achieve this distinction.” Snyder, 893 So.2d at 488 (Johnstone, J., dissenting).